20270

Dorothy B. DUNCAN, Individually and representing all other taxpayers and property owners within the County of York, Petitioner, v. The COUNTY OF YORK et al., Respondents.

(228 S. E. (2d) 92)

330

*John C. Hayes, Esq.,* of *Hayes, Brunson and Gatlin,* Rock Hill, *for Plaintiff,*

*Messrs. Melvin B. McKeown, Jr.* and *John M. Spratt, Jr.,* of *Spratt, McKeown & Spratt,* York, *for Defendants,*

August 11, 1976.

LITTLEJOHN, Justice:

We are called upon in the original jurisdiction of this Court to construe New Article VIII of the South Carolina Constitution, ratified March 7, 1973. More specifically, we are asked to determine whether Act No. 283 (or parts thereof) of the 1975 Acts of the General Assembly (§ 14-3701 *et seq.*, Code of Laws of South Carolina, 1975 Supp.) and Act No. 448 of the 1975 Acts, and Act No. 467 of the 1976 Acts, are repugnant to this constitutional provision. These acts relate to local government, often referred to as "home rule."

Under the Constitution of 1895 (effective prior to 1973), there was nothing to prevent the legislature from enacting many local laws, such as the County Appropriations Act or County Supply Bill. This it did, and for all practical purposes the county government was controlled by the Acts

of the General Assembly. Insofar as local legislation was concerned, this meant, of course, that the county delegation to the General Assembly was the governing body of the respective counties. Although the local acts were approved by the entire General Assembly, it is common knowledge that only legislative delegations from the counties affected concerned themselves with local bills. If the clerk of court wishes to seek a raise in salary, he would pursue the legislative delegation in the State Capitol. If the register of mesne conveyance wishes to seek an increase in the recording fee of a deed, he did likewise.

Over the years, this system of operating county government became sufficiently undesirable that many local governing boards were created even before Article VIII was ratified.

A review of the Acts of the General Assembly over the years shows that far more local bills than state-wide bills were enacted. In addition to being state legislators, members of the Senate and of the House were effectually the county legislature and governing board.

Until 1967, each of the forty-six South Carolina counties had one senator; each county had at least one house member, and two counties had as many as eleven, allocated upon the population of the respective counties. There was in existence in each county a well-defined, county-oriented legislative delegation (composed of one senator and one or more house members), which represented all the people of the entire county, and its members were answerable to the electorate of that county.

As a result of the reapportionment decisions of the Supreme Court of the United States, South Carolina was forced to abandon the one county-one senator concept. Reapportionment of the Senate was required, such that each of the forty-six senators now represents approximately the same number of people. This resulted in the abolition of forty-six senatorial districts (one for each county) and in

the creation of sixteen senatorial districts, such that most senators now represent more than one county, and some as many as five counties. In some instances, several senators represent several counties forming one senatorial district.

In 1974 the House of Representatives was reapportioned, also, such that today each house member has a separate house district. With rare exceptions, house members do not represent an entire county and, in some instances, a house member's district is comprised of portions of more than one county.

It is thus seen that the complexion of the legislative delegation has changed such that there is no longer a county-oriented legislative delegation elected by the voters of an entire county and answerable to the people thereof, as was the case prior to 1967.

The demise of the delegation as it formerly existed, and the inconvenience of persons having to go to the State House and to the State Legislature in Columbia to seek laws of purely local nature, brought about a clamor for what is commonly referred to as "home rule."

It is in this setting that the committee, which proposed a revised constitution, made its recommendations, resulting in the approval of New Article VIII by the people in November 1972, and its ratification by the General Assembly in March of 1973.

New Article VIII in the Constitution is entitled, "Local Government." It concerns (1) county government, and (2) municipal government. Relative portions affecting counties are as follows:

"§ 1. Powers of political subdivisions continued.—The powers possessed by all counties, cities, towns, and other political subdivisions at the effective date of this Constitution shall continue until changed in a manner provided by law.

\* \* \*

"§ 7. Organization, powers, duties, etc., of counties; special laws prohibited.—The General Assembly shall provide by general law for the structure, organization, powers, duties, functions, and the responsibilities of counties, including the power to tax different areas at different rates of taxation related to the nature and level of governmental services provided. Alternate forms of government, not to exceed five, shall be established. No laws for a specific county shall be enacted and no county shall be exempted from the general laws or law applicable to the selected alternative form of government.

\* \* \*

"§ 17. Construction of Constitution and laws.—The provisions of this Constitution and all laws concerning local government shall be liberally construed in their favor. Powers, duties, and responsibilities granted local government subdivisions by this Constitution and by law shall include those fairly implied and not prohibited by this Constitution."

The General Assembly is a creature of the Constitution. Ours is not a grant of authority to the General Assembly; it is a limitation on the General Assembly. The legislature, under its plenary powers, may enact any law not specifically, or by implication, prohibited. It must enact those laws mandated in the Constitution itself.

From a reading of § 7 above, it is clear that there is imposed upon the legislature certain duties. It is required to provide for the (1) structure, (2) organization, (3) duties, (4) functions, and (5) responsibilities of the counties, and in so doing is required to include a grant to the counties of (6) "the power to tax different areas at different rates of taxation related to the nature and level of governmental services provided." It is further required to provide at least two, but not more than five, alternate forms of county government.

It should be noted that the legislature has, under its plenary powers, substantial discretion in several pertinent areas. In establishing the classifications of the

counties to use the alternative forms, no guidelines are given. Presumably the classifications might be based on population, or other criteria. There is no requirement that the General Assembly permit the people of the respective counties to choose the form of government under which they shall operate. There is no requirement that the county governing board be elected from defined single-member districts. Section 7 does not mandate the number of persons to compose the governing boards, nor designate the length of terms. The alternate forms may be changed from time to time by general law.

The exercise of discretion in these areas is, however, subject to limitations. The forms of government must be provided "by general law." In order to assure that counties within the same classification be treated similarly, and in order to assure the mandate for "home rule," § 7 limits the powers of the General Assembly by providing: "NO LAWS FOR A SPECIFIC COUNTY SHALL BE ENACTED AND NO COUNTY SHALL BE EXEMPTED FROM THE GENERAL LAW OR LAWS APPLICABLE TO THE SELECTED ALTERNATIVE FORM OF GOVERNMENT." (emphasis added)

This is consistent with §§ 8 and 10 of the same Article, which relate to municipalities, and is a part of the overall plan to relieve the General Assembly of operating local governments:

"§ 8. Incorporation of new municipalities; readjustment of municipal boundaries; merger of municipalities; special laws prohibited.—The General Assembly shall provide by general law the criteria and the procedures for the incorporation of new municipalities . . . . No local or special laws shall be enacted for these purposes; . . .

\* \* \*

"§ 10. No law or exemption for a specific municipality to be enacted.—No laws for a specific municipality shall be

enacted, and no municipality shall be exempt from the laws applicable to a particular form of government selected by any municipality as authorized by Section 9 of this article."

In an effort to comply with the constitutional mandate, the legislature, in 1975, enacted into law Act No. 283. It is a general law designed to implement § 7 of Article VIII by establishing five alternate forms of county government. The alternate forms are referred to as Form 1 (Council); Form 2 (Council-Supervisor); Form 3 (Council-Administrator); Form 4 (Council-Manager); and Form 5 (Board of Commissioners). Section 14-3702. The Act authorizes a referendum at the instigation of the General Assembly, the local governing body, or a petition of the electorate, to allow the people to select which of the five forms their county will operate under; it also permits a referendum so that the voters may determine whether the county governing body is selected from "at large" or from "single member" districts.

Section 14-3703 of Act No. 283 enumerates the powers delegated to the governing bodies created by Forms 1, 2, 3 and 4. All of the powers will not be enumerated herein. The vast extent of the authority conferred upon these four forms of government is typified by the following:

Each has the right to:

"assess property and levy *ad valorem* property taxes and uniform service charges, including the power to tax different areas at different rates related to the nature and level of governmental services provided and make appropriations for functions and operations of the county, including, but not limited to, appropriations for general public works, including roads, drainage, and other public works; water treatment and distribution; sewage collection and treatment; courts and criminal justice administration; correctional institutions; public health; social services; transportation; planning; economic development; recreation; public safety, including police and fire protection, disaster preparedness,

regulator code enforcement; hospital and medical care; sanitation, including solid waste collection and disposal; elections; libraries; and to provide for the regulation and enforcement of the above; . . .

\* \* \*

"establish such agencies, departments, boards, commissions, and positions in the county as may be necessary and proper to provide services of local concern for public purposes, to prescribe the functions thereof, and to regulate, modify, merge or abolish any such agencies, departments, boards, commissions and positions, except as otherwise provided for in this title;

\* \* \*

"establish and implement policies and procedures for the issuance of revenue and general obligation bonds subject to the bonded debt limitations;

"grant franchises in areas outside the corporate limits of municipalities within the county in the manner provided by law for municipalities and subject to the same limitations, to provide for the orderly control of services and utilities affected with the public interest; . . .

\* \* \*

"enact ordinances for the implementation and enforcement of the powers granted in this section . . .

"undertake and carry out slum clearance and redevelopment work . . . ."

We think it a fair summary to say that under these four forms of county government, each county conducts its own governmental affairs (without the necessity of periodic General Assembly intervention) much like municipalities have heretofore operated in this State. This is consistent with the recommendations of the Constitutional Study Committee which proposed New Article VIII. In referring to Section 7, the committee said, "Of course, this restriction would demand that there be an active governing body in each

county which would have general powers of local government similar to those now exercised by municipal councils."

The Forms 1, 2, 3 and 4 are not under attack in this action. Form 5 is alleged by the plaintiff to be repugnant to Article VIII, and more specifically § 7 thereof. We agree.

The Board of Commissioners, under Form 5, are not allowed any of the powers enumerated hereinabove for Forms 1, 2, 3 and 4. Section 14-3785.2, which relates to Form 5, refers to the County Board of Commissioners as "the governing body of the county," but it does not confer upon the Board of Commissioners authority to govern. It does charge the Board "with the administration of county affairs" and proceeds to limit those things which the Board may do. They are largely, if not entirely, administrative in nature.

The Board of Commissioners, under Form 5, has no authority to levy taxes or appropriate money. It is permitted to hold hearings "of all budget requests and the submission of the proposed budget for the operation of the affairs of the county which shall be submitted to the General Assembly not later than March fifteenth for appropriate action." It could be no more than a recommendation to the General Assembly. The General Assembly, under this arrangement, could adopt the recommendation or reject the same *in toto,* or modify it as desired, any of which would be "appropriate action." Such action would be, of necessity, for a "specific county."

Under Form 5, all appointments to Boards, Committees, and Commissions would be made by the Governor "upon approval of a majority of the members of the legislative delegation, including the Senator or Senators of the particular county."

Section 14-3785 provides that Form 5 government shall consist of a governing board of "not less than four nor more than twelve commissioners, as may be determined by the

General Assembly for *each county* electing to adopt" Form 5. (Emphasis added.)

Section 14-3785.1 provides that the method of election and terms of office, of either two or four years, for the Supervisor and Board of Commissioners under Form 5 shall be as the General Assembly may provide.

We think that Form 5 is constitutionally repugnant to Section 7 of Article VIII, because it permits a county to carry on business as before, after the people, speaking through the constitution, have mandated a change.

The power to govern a county must be some place. Act No. 283 has granted the authority to counties using Forms 1, 2, 3 and 4, as necessary for the conduct of orderly county government. This is where the constitution demands that the authority be.

Under Form 5, the General Assembly has retained to itself basically the same authority it has heretofore had since the Constitution of 1895.

It is impossible for a county to operate under Form 5 without enactment by the General Assembly of "laws for a specific county." If a county, operating under Form 5, needed to (1) levy *ad valorem* taxes, or (2) establish agency departments, etc., or (3) issue bonds, or (4) grant franchises, or (5) levy license taxes, or (6) undertake to carry out slum clearance development, or (7) establish Boards, Committees and Commissions within the county, or (8) enact the budget into law, laws for a specific county would have to be approved by the General Assembly. There is simply no way these things, necessary to conduct government, can be accomplished by a Form 5 county, other than by legislation for a specific county, which is prohibited.

The constitutional intent is made clear by § 7, that the local governing authority shall have the taxing power. It is required that the General Assembly provide by general law for certain powers "including the power to tax different

areas at different rates." Not only does Act No. 283 fail to give the Board of Commissioners, under Form 5, the right to tax at different rates, it gives to it no right whatsoever to tax.

The requirement that the General Assembly give to ██ ██ the local governing body taxing authority, by reason of Article VIII, § 7, can be harmonized with Article X, § 5, which provides that "The corporate authorities of counties . . . may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same."; and can be harmonized with Article X, § 6, which states that "The General Assembly shall not have power to authorize any county or township to levy a tax or issue bonds for any purpose except for" certain enumerated purposes. Article X deals in generalities, while Article VIII is a specific mandate. The authority of the General Assembly to tax is not in question. It simply may not impose tax on a specific county. We find no merit in the contention that § 7 of Article VIII merely removes the requirement that taxation must be uniform throughout the county. We are of the opinion and hold that those portions of Act No. 283 which provide for County Board of Commissioners form of government (Form No. 5) are unconstitutional.

Objection is made to the retention by the General ██ Assembly of the power to provide for the number of councilmen, or commissioners, and the power to set terms of office for council members in each county at either two or four years, and the power to control the composition of single-member districts. As indicated hereinabove, the General Assembly has considerable plenary powers in these areas, but the Constitution prohibits dealing with these subjects on a county by county basis. The authority must be exercised over the counties on a state-wide basis, or by classifications. A law for a specific county in

these areas is not constitutionally permissible except as here-inafter qualified.

Plaintiff also objects to retention by the General Assembly of the power to appoint until January 1, 1980, all county boards, committees and commissioners, whose appointment is not provided for by the general law or the Constitution (§ 14-3714). There is imposed upon the General Assembly, at least by implication, the duty of providing for an orderly transition of power from the old system to the new. We cannot say that the retention of this power of appointment is not at least reasonably necessary, or debatably so, to an orderly transition, and inasmuch as there is a strong presumption of constitutionality of all legislative acts, we refrain from holding that this authority is not constitutionally permissible.

Nothing in the Constitution demands a referendum for the selection of one of the forms of county government. The right to a referendum is statutory. Act No. 283 (§ 14-3701) provided for a referendum prior to July 1, 1976, at the direction of either (1) the General Assembly, (2) the governing body, or (3) a petition by the electorate. It is further provided that if no referendum is held, each county "shall [beginning July 1, 1976] have the form of government . . . most nearly corresponding to the form in effect in the county immediately prior to that date, . . ." The act then proceeds to catalog the forty-six counties into four of the five forms of county government. No county is assigned Form 4.

Plaintiff submits that Act No. 283 is unconstitutional, at least in part, because it allows counties not holding a referendum to remain with their presently structured form of local government. It is argued that this allows county governments, not tailored to either of the five forms to exist. There can be no doubt but that Article VIII requires that all counties come to operate under one of the

forms of county government established by the General Assembly, however, a period of transition is contemplated. When a referendum is held, the act requires that the governing body "by resolution provide for adoption of the form of government selected in the referendum, . . ." The implication is clear that the governing body shall, in the absence of a referendum, provide for the adoption of the form of government assigned to it in the act. This would not, of course, apply to Form 5, which has been held invalid. In addition, there is no showing before this Court in this case that any county is now operating inconsistent with the approved forms. York County held a referendum, and the local governing body has provided for the adoption of the form selected by the people. York County citizens have no standing to raise the issue.

We now consider the attack of the plaintiff on Act No. 448 of the Acts of the General Assembly of 1975. Act No. 283, ruled upon hereinabove, provides that "Each county . . . may, prior to July 1, 1976, conduct a referendum to determine the wishes of the qualified electors as to the form of government to be selected." Act No. 283 goes further to provide that "The referendum may be called by an act of the General Assembly, resolution of the governing body, or upon petition of not less than ten percent of the registered electors of the county." On June 28, 1975, the General Assembly approved Act No. 448, with title as follows:

"An Act To Provide For A Referendum To Select A Form Of County Government For York County On Tuesday, November 4, 1975, Pursuant To Section 14-3701 Of The 1962 Code."

Pursuant thereto, the five forms of government, referred to hereinabove, were submitted to the electorate of York County, resulting in approval of the Council-Manager form (Form 4).

Plaintiff's attack on this Act is two-fold. First, it is argued that this is an act for a specific county, repugnant to

§ 7 of Article VIII; secondly, it is argued that the election should be declared invalid because there was included on the ballot Form 5, which is unconstitutional. It is submitted that if those persons who wasted their ballot by voting for Form 5 had been permitted to choose between the four valid forms of government, the result could have been different.

There can be no doubt but that Act No. 448 is an act for a specific county. We think, however, it is constitutionally permissible as a "One-shot" proposition, in view of § 1 of Article VIII quoted hereinabove. That section dictates that "The powers possessed by all counties . . . at the effective date of this Constitution shall continue until changed in a manner provided by law." This constitutional provision contemplates that legislation by the General Assembly would be required to bring about an orderly transition, but such authority is a temporary nature and extends only to the point necessary to place Article VIII fully into operation.

The argument that the entire election should be voided because the fifth form, now declared unconstitutional, was included on the ballot, is without merit. If, in an election to fill a public office, it should develop, after the election has been declared, that one of the losing candidates was ineligible to serve, it would hardly be contended that the election should be voided. If Form 5 had been selected, a new election would be in order. A review of the tabulations discloses that Form 5 was a very poor contender, and it is obvious that the Council-Manager form of government is the choice of the people of York County, indicated in an election conducted fairly. Plaintiff can take comfort in the fact that a new vote can be taken after two years, at the instigation of either the county governing body, or by petition.

We conclude that plaintiff's attack on Act No. 448 cannot be sustained.

Plaintiff next submits that Act No. 467 of the Acts of 1976 is unconstitutional. Act No. 283, ruled upon hereinabove, provided:

"A referendum may also be called to determine the wishes of the registered electors as to the question of whether the members of the governing body of the county shall be elected from defined single member election districts or at large from the county. Such referendum may be called by an act of the General Assembly, resolution of the governing body of the county or by petition of not less than ten percent of the registered electors. . . . In the event that the members of the governing body are required to be elected from defined single member election districts, the General Assembly shall provide for the composition thereof."

On January 21, 1976 (after the people had voted in the Council-Manager form), the General Assembly without a referendum approved Act No. 467. It is entitled:

"An Act To Provide For The Establishment Of Seven Single-Member Election Districts For The Election Of A Governing Body Of York County Pursuant To The Provisions Of Section 14-3701, Code Of Laws Of South Carolina, 1962, And Establish Terms For The Members Pursuant To Section 14-3706."

This act defines geographically the seven election districts and indicates the population of each. The act further provides that the terms of office of the members of the governing board shall be two years and that council members shall be initially elected in the general election in 1976.

Act No. 467 was approved soon after the people had selected the form of county government under which they desired their own county to operate. Although it too, like Act No. 448, is an act for a specific county, we think it constitutionally permissible as a "one-shot" proposition, in view of § 1 of Article VIII. We cannot say that this act is not reasonably related to the transition contemplated by the new constitutional article.

The constitutionality of Act No. 283 is further attacked upon the ground that it violates Article III, § 17, of the Constitution of this State, which requires that every law "relate to but one subject, and that shall be expressed in the title." The Act deals with both county and municipal government. The present contention is that these are separate and unrelated subjects within the meaning of the foregoing constitutional provision. We disagree.

The title clearly states that it is an Act to amend designated sections of the 1962 Code of Laws relating to both county and municipal government. Municipal and county governments are divisions of local government and, as such, are related. They are so classified in Article VIII of the Constitution, which Act No. 283 is designed to implement. The act combines implementing provisions relating to both county and municipal government into a comprehensive statute, pursuant to Article VIII, for the purpose of providing uniform local government. The legislation in question relates solely to this subject, which is adequately set forth in the title.

Defendants have argued that plaintiff has no standing to contest the validity of the Form 5 provisions of Act No. 283, because York County did not select that form. We think, however, that a ruling has been made necessary inasmuch as we have been required to determine whether the referendum election should be declared void by reason of the fact that Form 5 was included on the ballot. This question could not be answered until the validity of Form 5 was determined. We hasten to add that those counties today operating under Form 5 are not left without governmental authority. Section 1 of Article VIII, quoted hereinabove, provides that county governments shall continue to operate until changed in a manner provided by law. The General Assembly assigned Form 5 government to six counties. Counsel states that some of these have rejected Form 5 at the ballot box already, and are now operating

under either Form 1, 2, 3 or 4. Any county currently operating under Form 5 by reason of a vote of the people, or by reason of no election, may continue by reason of § 1 of Article VIII to operate as a Form 5 county temporarily until an orderly transition, which is mandated and which should not be unduly delayed, is brought about.

Some of the questions involved in this case have been at least relatively close. We think, however, all issues have been determined in keeping with the spirit, and the letter, of Article VIII. The rulings are consistent with the obvious efforts on the part of the electorate, and the General Assembly, to take local government out of the State House and place it in the Court House. Section 17, hereinabove quoted, requires this Court to construe the provisions of Article VIII liberally in favor of the establishment of local government. This we have done.

This action shall remain open for such additional orders as may appear appropriate, and all parties shall remain before this Court and subject to its jurisdiction.

NESS and RHODES, JJ., concur.

LEWIS, C. J., and GREGORY, J., dissent.

LEWIS, Chief Justice (dissenting) :

The majority opinion upholds the constitutionality of all provisions of the statutes in question, except the provisions of Act No. 283 (Section 14—3701 *et seq.,* Code Supplement) which create Form 5, the board of commissioners form of county government. I agree with the result of the majority opinion, except as to the conclusion reached relative to Form 5, and as to that, I dissent.

The contention that Act 283 is unconstitutional because of the inclusion of the board of commissioners form of government as one of the five forms to be submitted to the electorate is, in my opinion, without merit. The powers extended to the county governing body under this form are not as ex-

tensive as those granted to the governing body of those counties selecting one of the other alternative forms. Code Sections 14—3703 and 14—3785.2. The General Assembly retains the power to approve the county budget and the power of taxation is not given to the board of commissioners. In addition, the members of the board are appointed by the Governor with the consent of the county legislative delegation.

It is argued that the withholding of the foregoing powers makes the board of commissioners form inconsistent with the purpose and intention of Article VIII, Section 7. This contention is without merit.

Article VIII is silent as to the form, structure, organization, powers, duties, functions, and responsibilities of the forms of government to be established, and there is nothing in the language which evidences an intention to prevent the inclusion of the form of county government in existence prior to the amendment as one of the alternate forms to be presented to the electorate.

The Constitution of this State prior to the adoption of Article VIII, contained no provision "Establish[ing] a uniform or definite form of county government," *Lillard v. Melton,* 103 S. C. 10, 87 S. E. 421; and it is apparent that the main purpose of Article VIII was to establish definite forms of county government, not to exceed five, in order to achieve a degree of uniformity where none previously existed. This is indicated both by the language of Article VIII and the Final Report of the Constitutional Study Committee, pages 87 (Sections G and H) and 89 (Section L).

The General Assembly concluded, no doubt, that there were counties in South Carolina whose needs would best be served by the county board of commissioners form of government. This form is clearly consistent with the establishment of classes of county government. *It is not forced upon any county but may be adopted in any county only where the electorate chooses to do so.*

The fact that the members of the board of commissioners are appointed violates no provision of Article VIII. This provision is applicable to the class of counties adopting that form and there is no reason why the General Assembly may not exercise these powers so long as uniformity is maintained within the class.

The fact that certain powers are withheld from the board of commissioners while they are extended to the other forms of government does not in itself render the board of commissioners form unconstitutional. The General Assembly is given the discretion to specify which powers shall be extended to the county governing body under each alternate form of government.

The very fact that Article VIII made provision for alternate forms of county government implies an intention to allow for different powers under the several forms to meet the diverse needs of the counties of this State. The board of commissioners form is entirely consistent with that purpose of Article VIII, Section 7.

It is argued however that the failure to grant the taxing power to the board of commissioners form of government violates Article VIII, Section 7. This argument is based upon the premise that Article VIII, Section 7, requires that the power to impose local county taxes must be vested in the local governing bodies by directing that "the General Assembly shall provide by general law for the . . ., powers, . . . of counties, including the power to tax different areas at different rates of taxation . . ." This interpretation would, of necessity, have the effect of overruling by implication other provisions of the Constitution.

It is well settled that the General Assembly has full power over matters of taxation, subject only to express constitutional limitations. *Ward v. Cobb,* 204 S. C. 275, 28 S. E. (2d) 850.

The above provision from Section 7 of Article VIII must be construed in connection with Article X, Sections 5 and 6. Section 5 provides that "The corporate authorities of counties . . . *may be* vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same." (Emphasis added). Section 6 states that "the General Assembly *shall not have power to authorize any county or township to levy a tax or issue bonds* for any purpose except for" certain enumerated purposes. (Emphasis added). It cannot be argued that Article VIII invalidates Article X, Section 6, because Section 6 was amended in 1973 along with Article VIII and the quoted portion of Section 6 was left intact.

The provision of Article VIII, Section 7, relating to the taxing power was clearly designed to explicitly remove the restrictions of Article X which required uniform assessment and represents a departure from past practices in regard to the creation and support of special purpose districts. Article VIII does not constitute a grant of the constitutional power of county-wide taxation, which Article X provides *may* be vested in county governments.

Thus interpreted the provisions of the Constitution are harmonized, which, under settled principles, we are required to do, if possible.

While the majority states that Article VIII, Section 7, "can be harmonized" with Article X, Sections 5 and 6, the only attempt to point out how they may be harmonized is the statement that "Article X deals in generalities, while Article VIII is a specific mandate." This bald statement fails completely to come to grips with the patent conflict between Article X and Article VIII which the interpretation by the majority clearly creates.

It is further contended that the exercise of the powers retained by the General Assembly under the board of com-

missioners form will require laws for a specific county in violation of the provisions of Article VIII, Section 7, which prohibits the enactment of "laws for a specific county."

The State Constitution is not a grant but a limitation of legislative power; thus, the General Assembly may enact any law not expressly, or by clear implication, prohibited by the Constitution. *Elliott v. McNair,* 250 S. C. 75, 156 S. E. (2d) 421. The prohibition against laws for a specific county applies only to laws relating to those powers, duties, functions and responsibilities, which under the mandated forms of government are set aside for counties. *Kleckley v. Pulliam,* 265 S. C. 177, 217 S. E. (2d) 217.

Since counties are not autonomous and all-powerful but may exercise only those powers granted by the General Assembly under the selected form of government, it is readily apparent that the powers not extended to the counties under a particular form of government remain in the General Assembly to be exercised consistent with Article III, Section 34, which prohibits a special law if a general law could be made applicable.

I would uphold the constitutionality of the provisions of Act 283 creating the board of commissioners form of government. To the extent stated, I dissent from the majority opinion; but otherwise concur in the result.

GREGORY, J., concurs.