Robert R. WOODS, McKinley Washington, Jerry Williams, and Omega Newman, Individually and as Representatives of a class of registered electors of Charleston County, S. C., who oppose the present method of electing persons to County Council in the said County and State, Plaintiffs,

v.

Lonnie HAMILTON, III, James A. Stuckey Jr., George G. Durst, Robert N. King, Aaron A. Nettles, Jr., Gordan B. Stine, Milton A. Carson, Edgar A. Buck, and Marjorie R. Amos, all members of County Council, Charleston, S. C., Donald L. Infinger, Helen E. Clawson, Curtis Inabinett, Solomon Morse, Jr., and Robert O. Lighthart, Jr., all members of the County Election Commission, Charleston, S. C., Edwin Guenther, Inez A. Simpson, Jeanette B. Baxley, Gertrude D. Brown, Helen L. Hutchinson, all members of the County Board of Voter Registration, Charleston, S. C., County Democratic Executive Committee, Charleston, S. C., and County Republican Executive Committee, Charleston, S. C., Defendants.

UNITED STATES of America, Plaintiff,

v.

The COUNTY COUNCIL OF CHARLESTON COUNTY, SOUTH CAROLINA, Lonnie Hamilton, III, James A. Stuckey, Jr., George G. Durst, Robert N. King, Aaron A. Nettles, Jr., Gordan B. Stine, Milton A. Carson, Edgar A. Buck, and Marjorie R. Amos, Members; Charleston County Election Commission, Donald Infinger, Chairman, Charleston County Democratic Party, Cecil D. Clary, Chairman, Charleston County Republican Party, Glenn McConnell, Chairman, Defendants.

Civ. A. Nos. 78–873, 78–905.

United States District Court,
D. South Carolina,
Charleston Division.

July 3, 1979.

Wheeler M. Tillman, Charleston Heights, S. C., for plaintiffs.

Randall T. Bell, Columbia, S. C., Ben Scott Whaley, Ann C. Osborne, Leonard L. Long, Jr., Joseph S. Mendelsohn, Charleston, S. C., Glenn F. McConnell, North Charleston, S. C., for defendants.

Harvey B. Knudson, Jr., Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff in 78–905.

Before RUSSELL, Circuit Judge, and CHAPMAN and BLATT, District Judges.

## ORDER

These § 5 voting rights cases [1] are before this court based on plaintiffs' complaints asking this court to enjoin enforcement of Ordinances # 223 and # 224 of August 3, 1976, and a Resolution of July 6, 1976,[2] which implement "Home Rule" in Charleston County. Plaintiffs contend that these enactments constitute changes "with respect to voting" to which the Attorney General has objected in the exercise of his § 5 authority.[3] Additionally, plaintiffs challenge certain practices of the County Election Commission and Board of Voter Registration in connection with an unsuccessful Home Rule referendum petition drive in 1976, and they ask that these practices be enjoined until they are precleared pursuant to § 5.

This court heard argument on June 10, 1978, on plaintiffs' motion for an interlocutory injunction to enjoin the June 13, 1978,

---

**1.** 42 U.S.C. § 1973c.

**2.** For convenience, these will be collectively referred to as the "implementation ordinances," or "Home Rule Ordinances."

**3.** Section 5 provides in pertinent part: "Whenever a State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard practice or procedure with respect to voting different from that in force or effect on November 1, 1964 . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or

procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, . . . and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure; *Provided* That such qualification, prerequisite, standard, practice, or procedure may be enforced . . . if [it] has been submitted . . . to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission . . . ." 42 U.S.C. § 1973c.

primary election, and this motion was denied. On September 27, 1978, the court held a hearing on the issues involved and denied plaintiffs' request to enjoin the Charleston County General Election scheduled for November 7, 1978. Thereafter, the County defendants moved, on December 5, 1978, for summary judgment as to all issues; the court entertained that motion at a hearing on February 28, 1979, and took the matter under advisement. As will become apparent from the discussion below, recent events in other judicial forums have illuminated the path to resolution of the issues herein involved.

## BACKGROUND

A brief sketch of the South Carolina Home Rule Act, and the history of local government in Charleston County, must be reviewed in order to fully understand the present controversy. Unlike the majority of counties in South Carolina—(which prior to Home Rule[4] were governed by county legislative delegations consisting of the members of the South Carolina General Assembly from that county)—the Charleston County Council has, since 1949, governed that county with respect to local matters. Although Council has increased in membership since 1949, that body has consisted, since 1969, of nine councilmen who are elected by the registered electors of Charleston County, voting at-large for candidates residing in a specific area of the county. This so-called "at-large with a residency requirement" method of election was presented to the Attorney General in 1969 and precleared under § 5. It is undisputed that there have been no changes in the number, physical composition, or method of election of the County Council since that date; however, the plaintiffs contend that the assumption under the terms of the Home Rule Act of a legislatively preas-

signed form of government by enactment of local ordinances constitutes a "change" subject to § 5, a contention raising the first set of issues in this case.

The second group of issues is presented by those provisions of the Home Rule Act designed to afford the local populace a choice in methods of Home Rule governance. Under the Act, a county could either hold a referendum to choose a form of government from five specified forms,[5] or, in the absence of such referendum, be assigned a form by the Act itself (§ 4-9-10(b)). This Act provided three means whereby an initial local referendum could be held to determine the form of government and method of election—(one of two specified methods)—for each county. The three avenues envisioned to place a referendum on the ballot on the questions of form of government and/or method of election were (1) an Act of the General Assembly, (2) a resolution of the existing local governing body, or (3) a petition of not less than 10 per cent of the registered electors of the county—(S.C.Code § 4-9-10(a)). Since neither of the first two possible alternatives was utilized in Charleston County, it is the third method of initiating a referendum that presents the second set of issues in this case.

## IMPLEMENTATION OF HOME RULE IN CHARLESTON COUNTY

■ Plaintiffs' first contention is that the implementation of Home Rule in Charleston County through the Home Rule Ordinances represented an independent "change" which was subject to the preclearance requirements of § 5, notwithstanding the Attorney General's action approving the statewide Home Rule Act itself—(by not interposing an objection). A resolution of this issue requires close analysis of the applicable law and facts of this case to deter-

---

4. As used in this opinion, Home Rule refers to the exercise of governmental functions of a local nature by the local governing body—(i. e., County Council)—rather than by the legislative delegation, as had been the case in South Carolina in the vast majority of counties prior to the 1975 Home Rule Act.

5. The fifth form was declared unconstitutional in *Duncan v. County of York*, 267 S.C. 327, 228 S.E.2d 92 (1976).

mine the legal effect of the action of the Attorney General of the United States.

It is undisputed in this record that Charleston County submitted, and had precleared, a form of "Home Rule" in June, 1969, which provided for a nine-member council elected at-large with a residency requirement.[6] The 1975 Home Rule Act— (R. 396, Act # 283, S.C.Code § 4–9–10, *et seq.*)—as applied to Charleston County continued without change the exact form of government—(nine-member council)—and the exact method of election—(at-large, with residency requirement)—that had been earlier precleared; however, the 1975 Home Rule Act gave County Council a new name —(Council-Administrator form of government—S.C.Code § 4–9–10(b))—and increased its powers at the expense of the county legislative delegation. It is primarily this transfer of powers which the plaintiffs view as a "change" triggering the § 5 preclearance process.[7]

The issue of whether a transfer of power alone constitutes a "change" triggering § 5 has never been resolved by the United States Supreme Court and, so far as this court can determine, this theory has only been accepted as valid by one court, the United States District Court for the District of Columbia, in *Horry County v. United States,* 449 F.Supp. 990 (1978). However, even in the *Horry County* case, the acceptance of this theory was characterized as an "alternate reason" and, thus, such acceptance was not essential to the decision in the case. At oral argument, the attorney for the United States conceded that the issue is difficult, and he expressed his inability to draw a line between a reallocation of gov-

ernmental powers that would constitute a "change" affecting voting, and a reallocation which would not constitute such a "change." In any event, it is unnecessary for this court to address this problem because the court is of the opinion that, even if the transfer of power from the legislative delegation to the county council was a triggering "change", it was a "change" which was precleared by the Attorney General of the United States by his actions in connection with submission of the Home Rule Act and Charleston County ordinances. This conclusion is readily apparent from the analysis which follows.

On June 27, 1975, the South Carolina Attorney General's Office submitted the 1975 Home Rule Act—(R. 396)—for § 5 approval. The covering letter which accompanied the submission stated in full:

"For your consideration under the Voting Rights Act submitted herewith are certified copies of the following Act enacted by the General Assembly and approved by the Governor.

| Ratification Number | Date Approved |
|---|---|
| R 396 | June 25, 1978 |

We would request expeditious consideration of this Act. If additional information is needed, please contact me."

It is apparent from the above letter that the State submitted the *entire* Home Rule Act to the United States Attorney General for his consideration within the sixty-day statutory period. For the purposes of this opinion, the main features of the submitted Act were threefold:

1. It authorized the permissive holding of a referendum by each county to deter-

---

**6.** Additionally, Charleston County in 1969 had precleared a change in the method of election of the county treasurer and county auditor, both of whom are elected today by the same procedure in effect since that time.

**7.** The government plaintiff also takes the position that the choice itself under the Home Rule Act not to conduct a referendum, and the consequent assumption of an assigned form of government and method of election under S.C. Code § 4–9–10(b), constitutes a change in the form of government and method of election, even though the form and method of election of

the "new" government are the same as the "old" government. This court disagrees. The simple fact is that under the particular situation existing in Charleston County, the "old" and "new" councils are elected in exactly the same way and have exactly the same composition. As the Supreme Court of South Carolina noted in *Infinger v. Edwards,* 268 S.C. 375, 234 S.E.2d 214 (1977), the two Charleston County Councils exhibit "absolute identity" in relation to form of government and method of election. Therefore, this court holds that there has been no "change" as to these two factors.

mine a form of government which additionally included a method of election. (S.C.Code § 4–9–10(a), (b)).

2. It transferred to the counties, *regardless* of the choice made in (1), substantial powers. (S.C.Code § 4–9–30).

3. It mandated the assumption—(either by choice or inaction)—of a particular form of government by each county. (S.D.Code § 4–9–10).

In his response to the June 27, 1975, submission, the United States Attorney General wrote the Attorney General of South Carolina on August 28, 1978, as follows:

"This is in reference to the South Carolina Home Rule Act (R. 396), submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965. Your submission was received on June 30, 1975.

The Attorney General does not interpose an objection to the Act, insofar as it authorizes each county and city to hold a referendum on the question of the form of its government. However, because the Act requires additional action by the State Legislature prior to each of the State's 46 counties adopting a form of government under this Act, it will be necessary that each such form of government be submitted for federal review under Section 5 of the Voting Rights Act. It is our understanding that the additional action required by the Legislature includes providing for the number of the councilmen or commissioners for those counties which select an at-large method of election and, in addition, designating the districts for counties selecting district elections of county officers. In addition, those counties which do not conduct an election to change the form of government will be assigned a form of government according to the provisions of Section 14–3701(b) of the Act. This assignment of such forms of government also constitutes a change which is subject to the preclearance requirements of the Voting Rights Act of 1965.

With regard to municipalities, the provisions of Articles 2 and 8 of the Act require the municipalities to either adopt a new form of government or forfeit their articles of incorporation. Both the adoption of a new form of government and the forfeiture of the articles of incorporation are changes within the meaning of Section 5 which must be submitted for federal review prior to their implementation.

Lastly, the failure of the Attorney General to interpose an objection to this Act at this time does not bar any subsequent judicial action to enjoin enforcement of such changes."

A close reading of this letter reveals that (1) the Attorney General expressly did not object to the holding of a referendum; (2) he attempted to reserve the right to object to the implementation in the counties of the several forms of government—(which by statute included the methods of election, S.C.Code § 4–9–10(b)); and (3) he made no mention of the transfer of powers. A review of the applicable legal principles convinces this court that the effect of the letter was to preclear both the holding of referenda and the transfer of powers, so that these matters could proceed without further preclearance. This determination, combined with this court's finding that there was no change as to the method of election and form of government—(see fn. 7, supra)—leads to the conclusion that Charleston County has, based on the letter of August 28, 1975, from the Attorney General of the United States, made a valid transfer of powers to its local governing body.

The decision in *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977) compels, in this court's opinion, a holding that the Attorney General has only sixty days (60) days in which to act on a *completed* submission. The statutory scheme makes his failure to object to such submission, or to any part thereof, within that period tantamount to approval. (97 S.Ct. at 2419). As the United States Supreme Court clearly stated:

"In light of the potential severity of the § 5 remedy, the statutory language, and

the legislative history, we think it clear that Congress intended to provide covered jurisdictions with an expeditious alternative to declaratory judgment actions. The Congressional intent is plain: the extraordinary remedy of postponing the implementation of validly enacted state legislation was to come to an end when the Attorney General failed to interpose a timely objection based on a complete submission. Although there was to be no bar to subsequent constitutional challenges to the implemented legislation, there also was to be 'no dragging out' of the extraordinary federal remedy beyond the period specified in the statute." *Id.* at 2420. [citations and citation to footnote omitted].

Here, the Attorney General's silence on the transfer of powers in the Home Rule Act clearly dooms his belated attempt to label the assumption of such powers by the county council as an "uncleared change." Whatever may have been the motive of the Attorney General in failing to object to the transfer of powers in his August 28, 1975, letter, the fact remains that the State submitted the entire Home Rule Act and, under the law, the Attorney General of the United States was required to pass on all components of a complete submission at that time (*i. e.*, at the least, those steps in the submission certain to occur without further action, or requiring only further ministerial action on the part of the state political entity). In this respect, the case differs significantly from the situation in *United States v. Board of Commissioners of Sheffield, Alabama*, 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978), in which case the city

submitted a letter which "sought approval only for the holding of the referendum" (98 S.Ct. at 982). In that case, the Attorney General was informed in the submission letter that if the holding of a referendum was precleared, and the proposal to change the form of government was approved in such referendum, the city would, under the statutory law, revert to a prior form of government; however, the submission letter did not request preclearance for the form-of-government "change" but the letter merely volunteered such information in the submission statement. Since the question of preclearance of the admitted "change" to a different form of government was not presented to the Attorney General, the Supreme Court held that when that "change" was, in fact, accomplished, it would have to be submitted. In the present case, however, the *mandatory* transfer of powers *was submitted* to the Attorney General, and he was charged with the knowledge from a review of the Act that, regardless of the form of government chosen or assigned, the new government would assume the enumerated powers.[8] In this posture, it is an inescapable result, in this court's opinion, that the failure to object to the transfer of powers precleared that "change"—(assuming, *arguendo*, that such transfer was a "change")—depriving the Attorney General of a "second bite at the apple" at any subsequent time.[9] The situation here closely resembles that found in *United States v. Georgia*, C/A 76–1531A (N.D.Ga.1977) *aff'd* 436 U.S. 941, 98 S.Ct. 2840, 56 L.Ed.2d 782 (1978),[10] where the Attorney General overlooked a change contained in the Georgia Election Code and

**8.** S.C.Code § 4–9–30 provides "Under each of the alternate forms of government . . . each county government within the authority granted by the Constitution and subject to the general law of this State shall have the following enumerated powers which shall be exercised by the respective governing bodies thereof: . . . ."

**9.** Plaintiffs' contention that the assumption by the local body of designated precleared powers through enactment of adopting resolutions is also a "change" is an exceedingly thin reed, since the Attorney General's failure to object to

this mandatory requirement—(§ 4–9–10(a)) (Plaintiff's Exhibit # 10)—precludes a later attempt to label this ministerial act an unprecleared "change"; but, in any event, as discussed subsequently, the Attorney General by his actions also precleared that local enactment, if any preclearance were needed.

**10.** Although the precedential effect of an affirmance without opinion is limited, such a decision does control factual situations similar to that presented to the Supreme Court in such instances. *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977).

precleared the entire submission, preventing a later attempt to review the implementation of the Code in several counties. In the instant case, whether by oversight or design, the Attorney General did not object to the mandatory transfer of powers, and he is bound by his inaction.

Plaintiffs' final argument concerning the implementation of Home Rule in Charleston County is that, even if the transfer of powers to Charleston County were precleared, and even if both old and new county government were identical, the resolution and ordinances passed by County Council implementing Home Rule constituted "changes." This argument fails for two reasons.

■ First, it is doubtful that the ministerial act of passing adoptive ordinances, such as done here, was ever intended by Congress to be a "change" when such adoptive ordinances merely implemented statutes which had previously been precleared. Secondly, even if Charleston County was required to submit the implementation ordinances to the Attorney General—(which this court has determined was not necessary)—the failure of the Attorney General to object to such implementation within sixty (60) days of receipt of the "complete submission" resulted in preclearance of those enactments.

On August 6, 1976, the Charleston County Attorney, pursuant to instructions from the State Attorney General, submitted the Home Rule Ordinances to the Attorney General of the United States for preclearance, which submission was received by the Attorney General on August 9, 1976. On October 8, 1976, the Attorney General responded to the submission, requesting specific information including "copies of the pleadings and decisions in all court cases which relate to the adoption of Home Rule in Charleston County." The County assembled all such information as was then available and forwarded it to the Attorney General. Among other things, the County provided copies of the pleadings and decisions of the Charleston County Court of Common Pleas in *Infinger v. Edwards* and *Dodds v.*

*Stuckey*, two cases concerning the implementation of the Home Rule Act in Charleston County. On November 11, 1976, the attorney for Charleston County, in a letter transmitting the aforesaid information, said:

> "I believe that this complies as fully as we can with your letter of October 8, 1976. However, if you feel that additional information is needed please let us know. . . . I shall forward to you within the next several days the election statistics with an indication of the race of each candidate since January of 1968."

On November 12, 1976, the County forwarded the final available items of information requested by the Attorney General. In the cover letter of November 12, the County Attorney stated:

> "This is about the information we have been able to assemble and I believe complies with your letter of October 22nd, [sic] 1976."

No further requests for information were made by the Attorney General.

On January 13, 1977, the fifty-ninth day after Charleston County had supplied him with all requested information available, the Attorney General responded to the submission, as follows:

> "This is in reference to the implementation of the South Carolina Home Rule Act by Charleston County, South Carolina, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended.
>
> Because the method of electing the Charleston County Council pursuant to the South Carolina Home Rule Act is now pending before the South Carolina Supreme Court, the Attorney General does not have sufficient information at this time to enable him to make a determination that the implementation of the South Carolina Home Rule Act by Charleston County will not have the purpose or effect of denying or abridging the right to vote on account of fact.
>
> At such time as this matter is resolved by the South Carolina Supreme Court and a

referendum is subsequently held if so ordered, we will be happy to undertake a review of the change pursuant to Section 5. Please notify this Department as soon as the pertinent decisions are rendered by the court."

On April 12, 1977, the South Carolina Supreme Court decided *Infinger v. Edwards* and *Dodds v. Stuckey*. Pursuant to an informal telephone request from the Attorney General, the attorney for Charleston County forwarded the opinions in *Infinger* and *Dodds* on April 13, 1977. The Attorney General received the decisions on April 15, 1977.

On June 14, 1977, over two hundred (200) days after he had received the information requested in his letter of October 8, 1976, which was all the information that the County could be expected to provide, the Attorney General interposed objection to the Home Rule Ordinances under § 5 of the Voting Rights Act of 1965. The County promptly requested the Attorney General to withdraw the objection on the ground, *inter alia*, that the Home Rule Ordinances were not changes in county government in Charleston County. On December 22, 1977, the Attorney General informed the County Attorney that the objection would not be withdrawn.

■ An analysis of the January 13, 1977, letter reveals that the Attorney General, realizing that Charleston County had supplied all the information that was available to it, attempted to defer a decision on the implementation of Home Rule in Charleston County until he received State Supreme Court opinions not then in existence; this, we hold, he could not do. A decision of the United States Supreme Court, filed since the commencement of this action, supports this court's view. In *Garcia v. Uvalde County*, 439 U.S. 1059, 99 S.Ct. 821, 59 L.Ed.2d 26 (1979), the Supreme Court summarily affirmed the decision of the three-

judge court below [11] which court had held that the Attorney General may postpone the commencement of the sixty-day period by a request for additional information from a § 5 applicant only once. Significantly, the three-judge court there had held:

"[o]nce the submitting authority complies with the Attorney General's request for additional information the sixty day period commences. The Attorney General may not further postpone the commencement of that period by requesting more information or by repeating his request for information which the submitting authority has already stated to be unavailable." 455 F.Supp. at 105–106.

In *Garcia*, the Court was concerned, as is this court, with the fact that last minute requests for additional information were being used to extend the Congressionally conceived sixty-day period more than three-fold.[12] Based on the holding in *Garcia*, this court has concluded that on November 15, 1976, when the county supplied the Attorney General with *all* the information which it had available concerning Charleston County Home Rule litigation, the sixty-day period commenced, and when such period subsequently expired on January 14, 1977, without an objection from the Attorney General, the Home Rule Ordinances were then "cleared" under § 5 of the Voting Rights Act. The argument of plaintiff-United States that the initial request for additional information was not satisfied until the State Supreme Court decided the cases involving Charleston County's implementation of Home Rule is unpersuasive and completely contrary to *Garcia*. Since these State Supreme Court opinions did not exist on November 12, 1976, when the County responded to the Attorney General's request, they were not "available" for submission. In this regard, *Garcia* completely answers plaintiffs' argument:

---

11. 455 F.Supp. 101 (W.D.Tex.1978).

12. In *Garcia*, the Attorney General finally interposed an objection approximately 205 days after the submission process started—455 F.Supp. at 104); here the objection surfaced on

June 14, 1977, over 210 days after all *available* information initially requested by the Attorney General was received by him on or about November 15, 1976.

". . . we find that the sixty-day period commenced on the date that the Attorney General's office received Uvalde County's response to the first request for additional information letter, June 1, 1976. By that date, the Attorney General had been supplied the information he requested in his May 19, 1976, letter except for the population (as opposed to the registered voters) information which the County Judge stated was not available. The submission was, therefore, according to the regulations, complete." 455 F.Supp. at 106.

Private plaintiffs' proposition that *Garcia* principles should not apply here because the County defendants were parties to the state court action—(and inferentially could delay a decision by the State Supreme Court)—is untenable. This court finds no evidence that the County defendants attempted to delay any such decision to avoid having to transmit State Supreme Court Opinions to the Attorney General, nor does this court, with its knowledge of State Supreme Court rules, believe that any litigant could materially affect the date upon which the State Supreme Court renders its opinions on submitted cases. Plaintiffs' last gasp on this issue is rejected.

## THE HOME RULE REFERENDUM PETITION DRIVE

As previously recounted, the Home Rule Act provided for the holding of a referendum to choose a form of government at the instigation of 10 per cent of the registered electors of the county. The Home Rule Act became effective on August 28, 1975, when it was precleared by the Attorney General; however, no home rule petitions were filed in Charleston County until April 28, 1976, sixty-three days before the July 1, 1976, statutory deadline for the holding of *both* the initial referendum and any runoff referendum resulting therefrom.[13] The County Election Commission set May 14, 1976, as the deadline for receipt of all Home Rule petition signatures and, upon advice of the South Carolina Attorney General, set the initial referendum election for June 15, 1976, with a possible runoff election on June 30, 1976, contingent upon the certification of petitions by the County Board of Registration. On May 31, 1976, the Board of Registration informed the Election Commission that the April 28, 1976, signature submission did not contain the requisite number of verifiable signatures, and the Election Commission cancelled the June 15, 1976, referendum election by a vote taken on June 3, 1976. Undaunted, petition proponents assembled additional signatures collected at the polls during the regularly scheduled statewide primary elections on June 8, 1976—(three weeks after the deadline for signature submission)—and submitted these to the Board of Registration on June 9, 1976. By June 19, 1976, sufficient signatures were verified to aggregate the 10 per cent needed to put the Home Rule issue to a referendum. Obviously, it was then too late to reschedule a referendum election for June 15, 1976, so the Election Commission commenced an action in state court to determine if an initial referendum election could be held after July 1, 1976. A negative answer came from the State Supreme Court in *Infinger v. Edwards,* 268 S.C. 375, 234 S.E.2d 214 (1977); thus, no legal Home Rule referendum could be held in Charleston County, and that county assumed its assigned form of government under S.C.Code § 4–9–10(b).

Plaintiffs' two main contentions concerning the petition drive are (1) that the May 14, 1976, deadline for submission of petition signatures and, (2) that the method of verifying petition signatures, were both changes affecting voting which required preclearance by the Attorney General.

13. S.C.Code § 4–9–10(a) provides that after the initial referendum is held on form of government "unless one form receives a majority favorable vote in the initial referendum, a second or run-off referendum shall be held two weeks after the first referendum at which time the two forms which received the highest number of votes shall again be submitted to the qualified electors for final selection of the form to be adopted." The South Carolina Supreme Court held that both elections must be completed under the statute before July 1, 1976. *Infinger v. Edwards,* 268 S.C. 375, 234 S.E.2d 214 (1977).

■ Plaintiffs' first contention concerning the May 14, 1976, deadline founders on their painfully narrow view of the facts. Plaintiffs contend that the date, May 14, 1976, becomes a talisman, so that if any pre-November 1, 1964—(the date that the Voting Rights Act became effective)—referendum election disallowed submission of signatures for a longer or shorter interval than the May 14, 1976—June 15, 1976, time period involved here, the May 14, 1976, date would constitute a "change" from prior preclearance practice. The defendants, on the other hand, urge that the concept of "change" must be viewed more broadly, so that if the County Election Commission chose a reasonable deadline date here, such deadline date would not constitute a "change" from prior practice even though the exact time interval might be altered. The court agrees that there was no "change" here in the way in which petition signature submission deadlines were set. In view of the fact that the Election Commission was preparing for the regularly scheduled June, 1976, statewide primary election when the Home Rule petitions first appeared, it was completely reasonable to set May 14, 1976, as the deadline for signature submissions. This conclusion is buttressed by the recent opinion of the South Carolina Supreme Court in *McCain v. Edwards*, S.C., 252 S.E.2d 924 (1979) in which that court held that the Edgefield County Election Commission was fully justified in refusing to hold a Home Rule Referendum election when sufficient signatures were not received and verified until June 4, 1976. In the course of its opinion, the Supreme Court reviewed the South Carolina election law and stated that in instances, like the Home Rule Act, when the time for submitting signatures and thereafter holding an

election is not statutorily specified "a reasonable notice is required" (252 S.E.2d at 926). Since the Charleston County Election Commission only attempted to provide the electorate with reasonable notice of the holding of a very important election, there was no "change" from past practice and no "preclearance" was required.

Under the Home Rule Act, § 4–9–10(a), as interpreted in *McCain v. Edwards, supra*, the Election Commission was charged with providing sufficient time, following the verification of petition signatures, to give reasonable notice of the referendum election to the electorate, including the holding of two public hearings explaining the various choices of government available under the Home Rule Act. The South Carolina Supreme Court specifically held:

(1) There was no duty on an Election Commission to proceed with plans for an election until it had been established that a sufficient number of qualified electors had signed the petition.

(2) At a minimum, more than three weeks notice is required for a Home Rule referendum election—(to place such an issue on the ballot)—determined from the date on which sufficient signatures are verified.

The plaintiffs here are in a more untenable position than those in *McCain v. Edwards, supra*, because, while the *McCain* signatures were verified by June 4, 1976, the signatures here were not validated until June 19, 1976. In any event, the May 14, 1976, deadline chosen by the Charleston County Election Commission was compatible with the statutory and common law practice in South Carolina as interpreted by the court in *McCain v. Edwards, supra*, and did not constitute a "change" from past election practices.[14]

---

14. In addition, the affidavit of the Chairman of the Charleston County Election Commission, Donald Infinger—(whose veracity has not been challenged)—states:

"That in the absence of specific statutory provisions to the contrary, it is the customary practice and procedure of the Charleston County Election Commission to allow approximately forty-five days for the conduct of all elections which it has the duty to conduct

. . . that he knows of his own personal knowledge that the aforesaid Commission set June 15, 1976, as the date for the run-off election, and May 14, 1976, as the deadline for receiving referendum petitions; that these dates were set by the Commission based on the aforementioned forty-five day period; and that the setting of these dates represented no change from the customary practices and procedures of the Charleston

The final issue raised by plaintiffs which merits discussion concerns the procedures used by the County Board of Registration to validate petition signatures. On this issue, it is safe to say that the private plaintiffs have been far more vociferous than the United States. Principally, the private plaintiffs charge that the standards used by the County Board of Registration to validate or invalidate the referendum petition signatures which were presented differed from those standards utilized for earlier petition drives and, therefore, were a "standard, practice or procedure with respect to voting"—(42 U.S.C. § 1973c)—different from that in effect on November 1, 1964, and required preclearance under § 5.[15] The defendants have not argued that standards governing validation of petition signatures would fall outside the ambit of § 5 coverage,[16] but they insist that the Board of Registration considered the signatures here involved in exactly the same manner as signatures for petition drives had been considered in Charleston County both prior to and after November 1, 1964.

It is a gross understatement to note that a search through state statutes and regulations for guidance uncovers little in the way of helpful information on standards for judging signatures in petition elections. Although S.C.Code § 7–11–70 and § 7–11–80 set forth the number of signatures and

qualifications for each elector whose name is sought to be included on a candidate's nominating petition, and S.C.Code § 7–13–350 establishes the time limitation for meeting the numerosity requirement, these provisions, being directed to the various Election Commissions, are not specifically applicable to a Home Rule petition. Rather § 4–9–10(c) provides:

"Referendums may be called by the governing body or upon petition of not less than ten per cent of the registered electors of the county. Petitions shall be certified as valid or rejected by the *county board of registration* within sixty days after they have been delivered to the board and, if certified, shall be filed with the governing body which shall provide for a referendum not more than ninety days thereafter." [17] (emphasis added)

Although § 4–9–10(c) grants specific duties to the Board of Registration with respect to "certifying" petitions, the Act sets out no standards for the Board to use in performing the certification. The record does not disclose, and this court has been unable to find, any articulated standards to guide a board charged with petition certification. A very recent official admission of a lack of state standards is found in an opinion of the South Carolina Attorney General to the State Election Commission, in which opin-

County Election Commission prior to that time."

15. As previously noted, as a result of the invalidation of a number of petition signatures and a holding by the Supreme Court of South Carolina voiding an extension of time in which to conduct a referendum, (*Infinger v. Edwards*, 268 S.C. 375, 234 S.E.2d 214 (1977)), no referendum was held in Charleston County. Under existing law, no further referendum *by petition* can be held until 1982, and then only on the form of government, not the method of election. S.C.Code § 4–9–10(c). *Op. Attorney General # — —* (opinion letter to Richland County Attorney, 2/13/78). However a referendum *called by the local governing body* is available until July 1, 1979, as to either form of government or method of election. (R. 831, 7/6/78).

16. Although the United States Attorney General did preclear the Home Rule Act which provided for the permissive holding of referenda,

in view of the absence of any submission to him of a proposed change in the method of validating signatures on a referendum petition, his preclearance of the Home Rule Act authorizing a petition cannot be read as a tacit approval of any changes—(if there were any)—in the manner in which signatures were to be adjudged.

17. While the quoted provisions are found in subsection (c) of § 4–9–10 which subsection generally involves referenda *subsequent* to the original (*i. e.*, 1976) referendum, it is likely that these provisions are equally applicable to the initial referendum under consideration here, since there are no other petition provisions found in the Home Rule Act concerning such initial referendum. The South Carolina Supreme Court has itself resorted to subsection (c) to get a "hint" about the "legislative thinking" concerning subsection (a). *McCain v. Edwards*, S.C., 252 S.E.2d 924, 926 (1979).

ion the Attorney General informed the Commission that, although neither the State Code nor judicial decision provided standards for judging the validity of petition signatures, the judging entity should have "some procedure to confirm that the petitions contained the required number of signatures of qualified registered electors," *South Carolina Attorney General Op. No.* —— (Opinion letter to Mr. James B. Ellisor, 9/22/78). Therefore, it appears to the court, since § 4–9–10(c) provides that the Board of Registration is the proper body to check petition signatures, in the absence of any contrary statute or pronouncement, that the standards used by that body are legal standards under state law,[18] and that any standards used by that body differing from those in effect on November 1, 1964, and not precleared would be subject to § 5 scrutiny.

At the several hearings held on these issues, private plaintiffs introduced an affidavit of a former member of the County Election Commission[19] to the effect that during her tenure there was no practice of examining individual petition signatures. Defendants have submitted the affidavit of the Secretary of the Election Commission who stated that the customary practice in Charleston County is to check individual petition signatures *only if the petition is questioned by a registered voter.* Clearly, these two affidavits are not inconsistent because both affidavits . agree that there was no customary practice of checking petition signatures; rather signatures were presumed valid unless challenged. Plaintiffs have produced no proof that unchallenged signatures were ever checked, that challenged signatures were not checked, or that different standards were utilized in checking the signatures themselves; they have simply failed to carry their burden of proof on this issue. The court, therefore, finds that there has been no "change" in the policy on certification of petition signatures.[20]

**18.** The parties agree, and this court finds, that there is no state exhaustion requirement under § 5 of the Voting Rights Act where the actions challenged bear the imprimatur of a legitimate státe political entity. (*Cf., United States v. Board of Commissioners*, 435 U.S. 110, 98 S.Ct. 965, 972,.55 L.Ed.2d 148 (1978) [§ 5 enforcement not contingent on earlier prosecution of traditional constitutional voting rights litigation]). This court, therefore, does not have occasion to determine whether in circumstances where a local body or official acted in flagrant *violation* of state law, the required state action nexus for § 5 would be present.

**19.** The affiant, Zilla Hinton, was an Election Commissioner from 1968 1970.

**20.** The court is aware of the probability that the issue concerning alleged changes in the referendum petition signature procedures may be moot as a result of the South Carolina Supreme Court decision in *McCain v. Edwards*, S.C., 252 S.E.2d 924 (1979). That case held that under state law, any referendum petition submitted less than three weeks prior to the initial referendum election date would be void, since such interim would not give the Board of Registration and the Election Commission, ample time to certify signatures as being valid and to publicize an election. And, more importantly to this case, that opinion indicates, in addition to the minimum three-week publication period, that the Board of Registration should have sixty (60) days to certify petitions, which

would make any petition submitted less than eighty-one (81) days before the initial referendum—(approximately March 26, 1976, in the case of a June 15, 1976, referendum)—ineffective as a matter of state law, if such petition were challenged. Since plaintiffs' first petitions were not presented to the Board of Registration until April 28, 1976, there exists the strong likelihood that these petitions could not have initiated a referendum in any event, and this court could be considering hypothetical questions concerning alleged changes to a petition having no legal effect under state law. However, since the *McCain* opinion is not definitive on the time limitation issue, this court has proceeded to the merits on the signature issue rather than dismiss this issue for mootness. Such determination will enable the United States Supreme Court, should there be an appeal here, to resolve the entire case rather than being faced with a finding of mootness on this issue which could materially delay final resolution of this case. *Cf., Miller v. Vitek*, 437 F.Supp. 569 (D.Neb.1977); *U.S.S.Ct. appeal filed* (12/20/77); *Probable jurisdiction noted* 434 U.S. 1060, 98 S.Ct. 1230, 55 L.Ed.2d 760 (1978); *remanded for determination of mootness*, 436 U.S. 923, 98 S.Ct. 2276, 56 L.Ed.2d 381 (1978); *determination that case not moot* (10/27/78); *cert. granted sub nom. Vitek v. Jones*, —— U.S. ——, 99 S.Ct. 2029, 60 L.Ed.2d 395 (1979).

This court has thoroughly considered all other contentions advanced by the plaintiffs and finds such contentions to be without merit. Based on the foregoing, it is

ORDERED, that the defendants' motions for summary judgment be, and the same hereby are, granted.

AND IT IS SO ORDERED.