Craton LIDDELL, a minor, by Minnie Liddell, his mother and next friend, et al., Appellees,

and

The Board of Education of the City of St. Louis, State of Missouri, et al., Appellees,

v.

Earline CALDWELL, a minor, by Lillie Caldwell, her mother and next friend, et al., Appellants.

No. 76–1228.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1976.

Decided Dec. 13, 1976.

Rehearing and Rehearing En Banc Denied Jan. 17, 1977.

Louis R. Lucas, Memphis, Tenn., for appellants; Barbara B. Dickey, Ratner, Sug-

arman, Lucas, Salky & Henderson, Memphis, Tenn., David A. Lang, Clayton, Mo., and Forriss D. Elliott, St. Louis, Mo., Nathaniel Jones, New York City, on brief.

John H. Lashly and Joseph S. McDuffie, St. Louis, Mo., for appellee, Bd. of Education; Paul B. Rava and Kenneth C. Brostron, Lashly, Caruthers, Thies, Rava & Hamel, St. Louis, Mo., on brief.

Joseph S. McDuffie and William P. Russell, St. Louis, Mo., on brief, for appellees, Craton Liddell and others.

Before LAY and BRIGHT, Circuit Judges, and TALBOT SMITH, District Judge.*

LAY, Circuit Judge.

In February 1972 five black parents and their minor children who were enrolled in the public schools in the city of St. Louis, filed a class action on behalf of themselves and others similarly situated, charging racial segregation and discrimination in the operation of the St. Louis Public Schools. They named as defendants the Board of Education of the City of St. Louis, the board members, the superintendent and district superintendents of the school system. On October 3, 1973, after discovery proceedings by all parties, the trial court allowed the case to proceed as a class action. By public notice the court invited other interested parties to intervene on or before December 1, 1973. No one applied for intervention.[1]

On February 24, 1974, the court requested that the parties file a written stipulation of facts. This was done on June 7, 1974. Exhibits filed with the stipulation have been continually supplemented to provide statistical data for the school years up to

1975–1976. On December 24, 1975, the parties entered into a consent decree which was approved by the trial court, the Honorable James H. Meredith, presiding. At that time the court ordered publication of the judgment to advise all members of the class and other interested parties that they should file any objections thereto by January 16, 1976. Six black pupils, through their parents and friends, and the St. Louis chapter of the NAACP filed objections and sought to intervene.[2] The original plaintiffs and defendants resisted both the objections and the intervention motion. Following a hearing, Judge Meredith overruled the objections. He denied the application for intervention on the grounds that it was untimely and that the class was adequately represented. He also found that the decree was adequate for the present time and gave all interested parties the opportunity to make additional suggestions to the court from time to time. A timely appeal was taken from that order.

■ The only issue before us concerns the right of the appellants-petitioners to intervene. Although the petitioners urge us to pass upon the constitutional validity of the decree as well, we decline to do so for at least two reasons. First, the decree does not represent a plenary desegregation plan and concededly is interlocutory in scope. Second, the record is deficient as to investigation and scope of possible solutions and plans to implement an effective desegregation order within the St. Louis school system. ·

■ After reviewing the record, we conclude that the district court, which has retained jurisdiction of the case, erred in de-

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. On October 30, 1973, defendants filed their motion for an order directing the plaintiffs to join as additional parties defendant the Governor, the Attorney General, the Commissioner of Education of the State of Missouri, the State Board of Education of Missouri, the St. Louis County Board of Education, the St. Louis County Superintendent of Education, and the twenty school districts in St. Louis County which con-

stitute the first two tiers of school districts adjoining the defendant school district of the city of St. Louis. The motion was denied on December 1, 1973.

2. On January 16, 1976, objections to the judgment were also filed by the Missouri State Teachers Association and by the St. Louis Teachers Union, Local 420. Neither of these organizations has sought intervention.

nying the appellants' motion to intervene. For the reasons stated, we do not pass upon the validity of the decree. Nonetheless, reference to the substance of the decree and to the claims of the respective parties is essential to the understanding of our ruling.

The petitioners seek intervention under Fed.R.Civ.P. 24(a)(2).[3] Intervention of right is required under the rule when: (1) the petitioners assert an interest in the subject matter of the primary litigation; (2) there exists a possibility that the petitioners' interest will be impaired by the final disposition of the litigation; (3) there exists a danger of inadequate protection by the party representing the petitioners' interests; and (4) the petitioners have made timely application to intervene.

▮ The parties generally agree that petitioners assert valid interests in the subject matter and that unless their interests are adequately represented those interests could be seriously harmed. We note public interest in the operation of a lawful school system and the fact that students and parents, regardless of race, have standing to challenge a *de jure* segregated school system. *See Johnson v. San Francisco Unified School Dist.,* 500 F.2d 349 (9th Cir. 1974); *Smuck v. Hobson,* 132 U.S.App.D.C. 372, 408 F.2d 175 (1969). The denial of the motion to intervene in the present case rests on the alleged lack of timeliness and a finding that the class is already adequately represented.

Recent pronouncements by the Supreme Court[4] and this court[5] govern our consideration of petitioners' timeliness in seeking to intervene. The guiding factors include consideration of the progression of the suit, the reason for the delay, and the possible preju-dice any delay due to intervention might cause the existing parties. More significant, however, is the rule that "[t]imeliness is to be determined from all the circumstances" of the case. *NAACP v. New York,* 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973). Although precedents under Rule 24(a)(2) are helpful, each case must rise and fall on its own peculiar facts and circumstances.

In the present case, it is urged that the petitioners were given ample opportunity to participate in the case from the beginning and were, in fact, invited to intervene before December 1, 1973, by the trial court. Ordinarily this factor standing alone would weigh heavily toward our sustaining the trial court's discretion in declining a petition to intervene made some three years later. *See United States v. Associated Milk Producers, Inc.,* 534 F.2d 113 (8th Cir. 1976). However, in the present case other factors must also be considered.

First, the reason given by petitioners for their failure to intervene earlier is that they concurred with the initial claims, seeking desegregation of the St. Louis school system, asserted by the original plaintiffs. Petitioners claim that there was nothing at that time, or at any other time until the consent decree appeared, to indicate to them that these shared claims were "being abandoned." Second, although the original complaint was filed in 1972, the present record is built upon stipulated facts which basically are not under attack; the stipulation appears to fairly set forth the basic history and statistics of the St. Louis school system. The petitioners do not attempt to assert a right to relitigate or undo the factual stipulations of the parties.[6] Third,

---

3. Fed.R.Civ.P. 24(a)(2) reads as follows:

(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

4. *NAACP v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973).

5. *National Farmers' Organization, Inc. v. Oliver,* 530 F.2d 815 (8th Cir. 1976); and *Nevilles v. EEOC,* 511 F.2d 303 (8th Cir. 1975).

6. There have been extensive discovery procedures culminating in the stipulation. However, we note that when the court originally invited other interested parties to intervene in October, 1973, a great portion of the discovery proceedings had already taken place.

the record indicates that a good deal of the delay from February 1972 to the time of the consent decree in December 1975 resulted from a stalemate between the parties as to how to achieve a plan of desegregation. Fourth, and of great significance to this court, is the fact that the district court, even as of this late date, has only partially approved specific plans for desegregation. The consent decree signed by the district court is interlocutory in nature, and as all agree, does not constitute the overall plan for desegregation. Under the district court order the school board is to make further study and must produce a "report" by January 15, 1977, with "implementation to begin September, 1977."

The petitioners' primary purpose in seeking intervention relates to their objections to the proposed remedy, that is, to the ultimate plan of desegregation. The petitioners urge that the consent decree falls short of requiring a plan which would comply with the constitutional mandate to create a unitary school system for St. Louis.

Considering all of these circumstances, and in view of the fact that only partial steps toward implementing a unitary school system have taken place, we find the district court erred in denying the petition for intervention for lack of timeliness. Although the time for developing a plan has long since passed, cf. Carter v. W. Feliciana Parish School Bd., 396 U.S. 290, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), unfortunately it is readily apparent that the complete deseg-regation plan is still on the drawing board. The record demonstrates that the effects of the previous de jure school segregation are still fully visible within the St. Louis School system.

As a second reason for rejecting the petition for intervention, the trial court found that petitioners' interests are being adequately represented. This finding is vigorously defended by the original plaintiffs and just as vigorously disputed by petitioners.

The controlling rule here is that representation is adequate if there is no collusion between the representative and an opposing party; if the representative does not have or represent an interest adverse to the applicant; or if the representative does not fail in the fulfillment of his duty. Stadin v. Union Electric Co., 309 F.2d 912 (8th Cir. 1962), cert. denied, 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415 (1963). See also Martin v. Kalvar Corp., 411 F.2d 552 (5th Cir. 1969); Peterson v. United States, 41 F.R.D. 131 (D.Minn.1966). Petitioners are apparently relying on the third alternative indicating inadequate representation—failure to fulfill duty. In finding that intervention should be allowed, we do not in any way impugn any element of bad faith to the original plaintiffs or the school board by their agreeing to the consent decree. We are confident that all parties, as well as Judge Meredith and the community at large,[7] have strived in good faith to find a

---

7. The School Board urges that the consent decree received the overwhelming approval of both races in the community and strong endorsements of the various St. Louis newspapers. The supplemental appendix, containing several newspaper articles printed following issuance of the consent decree, supports this contention. On the other hand, the same articles offer statements which, if true, would seem to support petitioners' contention that the parties have abandoned their goal of obtaining a plan for desegregation. For example:

St. Louis Post-Dispatch, December 24, 1975: "[T]he decree does not include any promises of specific changes besides the teacher transfers. . . ."

St. Louis Globe-Democrat, December 26, 1975, (quoting Ernest Calloway, an urban affairs expert and professor): "The whole problem has been one of quality, not whether black children have been going to school with white children."

St. Louis Sentinel, January 1, 1976: ". . Black parents have merely wanted equality in teaching. . . ."

Christian Science Monitor, January 16, 1976, (quoting Meyer Weinberg, nationally recognized expert on integration and lecturer at Northwestern University): "As long as a school system says 'we're not going to bus,' then they're not really going to desegregate."

St. Louis Post-Dispatch, January 18, 1976, (quoting original plaintiff, Liddell): "[I]n a city that is largely black, there might be some all-black schools. But all the children should have top-quality education and the option to go to an alternative school." The paper reports: "She said that she wanted to

workable solution to the difficult problem before them.[8]

The parties were faced with an admittedly *de jure* segregated school system whose district lines have been coterminous with those of the city since 1876. The total student population for the school term of 1975–1976 was 88,499 with the ratio of students being approximately 70% black and 30% white. Out of 147 public elementary schools in St. Louis the record shows that 121 (82.3%) had enrolled 90% or more pupils of one race. Of these, 87 schools had 90% or more black, and 34 had 90% or more white. Furthermore, 51 elementary schools were 100% black and 15 were 100% white. At the high school level, 12 of the 17 schools (70.5%) were comprised of 90% or more pupils of one race. The enrollment in 11 high schools was 90% or more black and one high school had 90% or more white. Seven high schools were 100% black. Thus, in the entire public school system, a total of 55,713 black pupils were enrolled in schools 90% or more black, and 16,442 white pupils were enrolled in schools 90% or more white. The original complaint filed in 1972, and the proposed findings of fact and conclusions of law submitted by the original plaintiffs, sought an end to the *de jure* dual school system for all students and faculty, and with respect to curriculum. As late as September 1974, the original plaintiffs proposed findings of fact and conclusions of law in accord with the petitioners' claims here.[9]

Petitioners now allege that the plaintiffs have abandoned their original goal. This, they claim, is evidenced by plaintiffs' consent to the entry of the December 1975 decree. One element of the decree which they specifically attack is its lack of an attempt to integrate any of the elementary or junior high schools. They complain that the decree contains only a general direction to the school board to make a study on the realignment of feeder zones affecting the high schools. The only specifics of the consent decree relating to desegregation of students read:

ORDERED, ADJUDGED AND DECREED that:

.    .    .    .    .

9. Before the beginning of the 1977–1978 school year, defendants shall make a study of realignments of all elementary feeder schools to the academic high schools for the purpose of reducing racial isolation and segregation at the said high schools, and shall submit a report thereon to the Court, on or before January 15, 1977, with implementation to begin September, 1977.

10. The defendants are hereby ordered to make a study and report to the Court on or before May 1, 1976 as to whether or not the following items will assist in eliminating or reducing segregation:

(a) Establishing elementary magnet schools with specialized curriculum,

---

avoid massive court-ordered busing because . . . [it would] not necessarily improve the quality of education."

8. The record reveals that since the consent decree the school district has broadened its magnet school program and has achieved some degree of success in doing so. However, in view of the small percentage of students participating, the magnet school program must be recognized as only an adjunct to a plan of desegregation and it cannot constitute the plan itself.

9. The complaint filed by the original plaintiffs succinctly summarizes the relief sought by their proposed decree of September 1974:

. . . that this court require the defendants to prepare and submit for approval of this court a plan for the operation of *all the*

*public schools within the defendant Board of Education school system* in conformity with the requirements of the Fourteenth Amendment, including, but not limited to, the nondiscriminatory allocation of financial and physical resources; *the establishment of school geographical boundaries and district geographical boundaries which are not racially identifiable; the location, construction and utilization of new buildings and the utilization of existing school buildings* in a manner which are (sic) not racially identifiable; *the assignment of pupil populations,* staffs, faculties, *transportation routes* and activities which are not racially identifiable; and that the plan be effective at the earliest possible date.

(Emphasis added).

having an open enrollment by application.

(b) Establishing high schools for the study of the visual and performing arts, for the study of mathematics and physical and natural sciences, and other subject areas, such schools having open enrollment by city-wide application.

(c) Recognizing that the above measures are basically experimental in nature, a study of the feasibility of curriculum improvements or other changes that should be instituted in the system as a whole shall be undertaken for the purpose of increasing the quality of education throughout the system, all within the context of reducing racial isolation in the schools and with the goal of desegregating the school system. A report shall be made to the Court by May 1, 1976, with implementation beginning with the school year 1976–1977.

Consent Judgment and Decree, filed Dec. 24, 1975.

On appeal petitioners attack the decree by saying:

The consent decree is constitutional (sic) inadequate in substance because it provides only for the transfer of personnel to desegregate the faculty of the public school system, and makes no provision for pupil reassignment. . . .

. . . [T]he decree makes no provision for desegregation of the elementary schools, which are almost totally black in a school system which was previously segregated by state law. The decree includes only a limited opportunity for desegregation of a very few schools through "free choice" enrollment in so-called "magnet" schools. Furthermore, while calling for "studies" of the reassignment of elementary feeder schools, reports of these studies are not due until January 15, 1977, with implementation delayed until September, 1977.

As we stated earlier, we do not believe that the merits of the consent decree are before us, since we consider the decree interlocutory in nature. We do observe, however, that if the overall plan to be submitted by the board contains major deficiencies in the respects asserted, the plan will encounter serious constitutional objection.[10]

In *Davis v. Bd. of School Commissioners of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971), the Supreme Court observed that: "[E]very effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation" must be made by school districts.[11]

---

**10.** Great stress has been placed by the parties in achieving and improving the quality of education within the St. Louis schools. Although efforts to improve the quality of education for all students is desirable, this emphasis fundamentally misapprehends the constitutional requirement of achieving a unitary school system. The achievement of quality education is not premised on the equal protection clause of the Fourteenth Amendment. Prior to *Brown v. Bd. of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), it had been urged that quality education could ·be made available to all students without integration. Separate but equal concepts have now long been rejected. Federal courts lack jurisdiction under the Fourteenth Amendment to require quality education in state school districts other than to erase the effects of prior school segregation. The sole goal of *Brown* is to erase the dual educational system and achieve unitary schools. Recognition of equal protection principles under the Fourteenth Amendment is focused on achieving a society that is not divided by skin color;

to this end it is important that black and white children accept one another at an early age. *See Brown v. Bd. of Educ., supra,* 347 U.S. at 494, 74 S.Ct. 686; *Kemp v. Beasley,* 389 F.2d 178 (8th Cir. 1968). Segregated school systems have undoubtedly resulted in a loss of *equal opportunity* for quality education for all students. However, it is the "equal opportunity," not the quality education which is germane to the constitutional concern.

**11.** If appellants' objections to the consent decree accurately anticipate the ultimate plan of the school board, we observe that such a plan would fall far short of the desegregation plans now required for the Atlanta, Georgia, and Detroit, Michigan, school districts.

As of September, 1975, the Detroit school district served 247,774 students with a 75/25 black-white ratio. Under the plan approved there 27,524 students were reassigned to integrated schools. The plan changed the racial balance of 105 of the approximately 300

In view of the difficult problems in working out a meaningful constitutional plan, we suggest to the district court that it invite the United States Department of Justice to intervene, and that the same invitation be extended to the Missouri State Board of Education. We recommend that the parties explore the creation of a bi-racial citizens advisory committee, which has worked so successfully in other areas of the country. The Supreme Court decision in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), seemingly deters the merger of two school districts unless racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or unless district lines have been deliberately drawn on the basis of race. *But cf., Newburg Area Council, Inc. v. Bd. of Educ. of Jefferson County, Ky.,* 510 F.2d 1358, 1360 (6th Cir. 1974), *cert. denied,* 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975). *See also United States v. Bd. of School Comm'rs of Indianapolis, Ind.,* 541 F.2d 1211 (7th Cir. 1976), *petition for cert. filed,* 45 U.S.L.W. 3372 (Nov. 16, 1976); *Evans v. Buchanan,* 416 F.Supp. 328 (D.Del.1976), *appeal dismissed for want of jurisdiction,* — U.S. —, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976). However, investigation into the voluntary cooperation of the county in accepting minority transfers should not be overlooked. *Cf. Milliken v. Bradley,* 540 F.2d 229, 235 n. 3 (6th Cir.), *cert. granted,* — U.S. —, 97 S.Ct. 380, 50 L.Ed.2d 325 (1976).

In view of the delayed implementation of any plan, we direct the district court to immediately grant the appellants' petition for intervention. In order to avoid future piecemeal appeals, we additionally direct that the district court hear, as soon as possible, any objections to the school board's January 1977 plan, and that within a reasonable time prior to entering its approval the court require that the parties submit alternate plans. In no event should implementation of plans for a unitary school system be delayed beyond the commencement of the 1977–78 school term.

Judgment reversed and remanded for further proceedings in the district court.

schools in the system. Under the plan no school had less than 30% black students. The Sixth Circuit recently remanded the district court order for reconsideration in an attempt to desegregate further in three black residential areas excluded from the plan, and to integrate the faculties up to a 50/50 ratio. *See Milliken v. Bradley,* 540 F.2d 229 (6th Cir. 1976), *cert. granted,* — U.S. —, 97 S.Ct. 380, 50 L.Ed.2d 325 (1976).

In Atlanta, Georgia, in 1975, 85% of students within the district were black, yet the most recent plan approved by the Fifth Circuit requires a 30% mix of black students in previous all-white schools. *Calhoun v. Cook,* 522 F.2d 717 (5th Cir.), *reh. denied,* 525 F.2d 1203 (5 Cir. 1975).

The study of these two desegregation plans reveals that under those circumstances complete integration was impossible. Both plans necessarily left several all black schools. Yet such studies disclose that district courts and school boards, facing more difficult problems than presently confronting the St. Louis system, are using every effort possible to achieve desegregation of prior *de jure* school systems. It should be obvious that anything less than similar efforts in St. Louis would fall short of constitutional requirements.