COUNTY COUNCIL OF SUMTER
COUNTY, SOUTH CAROLINA, et
al., Plaintiffs,

v.

UNITED STATES of America, et
al., Defendants.

Civ. A. No. 82–0912.

United States District Court,
District of Columbia.

Jan. 10, 1983.

As Corrected March 11, 1983.

Joseph W. Dorn, Kilpatrick & Cody, Washington, D.C., Randall T. Bell, M. Elizabeth Crum, McNair Glenn Konduros Corley Singletary Porter & Dibble, P.A., Columbia, S.C., Howard P. King, Bryan, Bahnmuller, King, Goldman & McElveen, Sumter, S.C., for plaintiffs.

Gerald W. Jones, Paul F. Hancock, J. Gerald Hebert, David S. Cunningham, III, Attys., Civ. Rights Div., Dept. of Justice, Washington, D.C., for defendants.

Armand Derfner, Washington, D.C., Laughlin McDonald, Atlanta, Ga., for defendants-intervenors.

Before BORK, Circuit Judge, and BARRINGTON D. PARKER and OBERDORFER, District Judges.

## MEMORANDUM ON MOTION TO INTERVENE

Seven black citizens who are registered to vote in Sumter County, South Carolina, at

least one of whom was a party in *Blanding v. DuBose,* 454 U.S. 393, 102 S.Ct. 715, 70 L.Ed.2d 576 (1982), move pursuant to Fed. R.Civ.P. 24 to intervene in this Voting Rights Act proceeding which is a sequel to *Blanding.* Some of the movants made representations to the Attorney General in opposition to the preclearance of the at-large voting method for Sumter County Council members at issue in *Blanding.* When the Attorney General first refused preclearance, Sumter County nevertheless continued to schedule at-large elections. Some movants and the United States sought to enjoin future at-large elections pending preclearance. After a three-judge District Court in South Carolina granted a preliminary injunction, but ruled for the County on the merits, the United States did not perfect its appeal; intervenors perfected theirs and prevailed in the Supreme Court on their contention that the Attorney General had not precleared at-large elections for the Sumter County Council. *Blanding v. DuBose, supra.*

Movants allege that they have an "intensely local" perspective with respect to the allegedly discriminatory effects and purpose of the change in elections methods effected by Sumter County that would be helpful to us and necessary to the full and proper resolution of this case.[1]

Movants also allege that the United States defendants may or cannot adequately represent movants' interests because those interests may diverge from defendants' conception of the public interest. In support of this allegation movants point to the failure of the United States to pursue its appeal in *Blanding,* contending that if they had not protected their own interests in the Supreme Court they would have already lost the rights which they preserved there and now defend here. In addition, movants point to defendants' change in position in the instant proceeding on October 27, 1982, at which time defendants abandoned a contention that in order to obtain a declaratory judgment of preclearance under Section 5 of the Voting Rights Act plaintiffs must demonstrate that the voting procedure change did not violate section 2 of the Act.

Movants represent that they would enter the case subject to all outstanding orders, that they do not seek to reopen discovery, and that in making a factual record without delaying the trial, they would rely principally upon an opportunity to examine and cross-examine witnesses called by others, and not attempt to call any other witnesses, except by leave of court if special circumstances arise.

Plaintiffs oppose the motion to intervene as untimely, and urge that, if it is granted, movants' participation should be limited to the filing of a post-trial memorandum. Plaintiffs object to movants' failure to seek to intervene until the close of discovery and on the eve of argument on motions for summary judgment. Plaintiffs claim prejudice in that they would have conducted their discovery and prepared and evaluated their case differently if the movants had been parties earlier. For example, plaintiffs say they would have conducted more extensive discovery had they known that Section 2 would be at issue. Plaintiffs emphasize the time essence here because there have been no local elections in Sumter County for six years, pending resolution of this controversy. In addition to the difficulty of confronting a Section 2 issue without discovery, plaintiffs urge that movants' intervention would necessarily make the trial longer, and more complicated and, for plaintiffs at least, more expensive. *See* Plaintiffs' Memorandum in Response to Petition for Leave to Intervene (Dec. 13, 1982).

Movants rely on a long line of cases in which this Court has routinely allowed intervention by persons situated similarly to movants,[2] and point to at least one other

---

1. *See* Plaintiffs' Memorandum in Support of Petition for Leave to Intervene (Nov. 26, 1982) at 4.

2. *Busbee v. Smith,* C.A. No. 82–0665 (D.D.C.) (order allowing intervention March 22, 1982);

case in which intervenors, and not the United States, made the only argument for their position in the Supreme Court. *City of Lockhart v. United States,* —— U.S. ——, 103 S.Ct. 998, 74 L.Ed.2d 863 (1982). Moreover, they cite authority that intervention should be allowed, even where the United States' interest is apparently parallel, upon a "minimal" showing that the United States' representation of the public interest as it views that interest "may" not adequately represent the movants' legitimate interest. *See Trbovich v. United Mine Workers,* 404 U.S. 528, 538–39 and n. 10, 92 S.Ct. 630, 636 and n. 10, 30 L.Ed.2d 686 (1972).

■ We are persuaded that, on balance, movants should be allowed to intervene on a limited basis. Although movants filed relatively late, they moved less than a month after defendants' abandoned the Section 2 issue. *See Liddell v. Caldwell,* 546 F.2d 768 (8th Cir.1977). Plaintiffs have not explained why the discovery they conducted before October 27, 1982, (when the defendants' Section 2 argument was at issue) did not prepare them to deal with that issue. Movants do not seek discovery or to relitigate old issues, but only to participate prospectively, and to assure a vigorous response to plaintiffs' claim. *See Natural Resources Defense Council v. Costle,* 561 F.2d 904 (D.C.Cir.1977). Their local perspective on the current and historical facts at issue could be enlightening to us. Finally, we are confident that we can effectively limit movants' cross-examination and other potentially time-consuming activities in the same way that we intend to control the presentations of the parties themselves so as to minimize the burden on them as well as on the Court, which unfettered intervention might otherwise entail.

The Section 2 issue cannot be ignored, at least upon first impression, and the intervenors will be permitted to pursue it, if they so desire, within the limits of their proposed intervention and such other limits as the Court may set. We may or may not be required to decide the Section 2 issue, but we will be better able to deal with it if we have evidence than if the argument were before us only in the abstract.

In passing the Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, 96 Stat. 131–135 (June 29, 1982), Congress amended Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, to read as follows:

SEC. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to

*City of Port Arthur, Texas v. United States,* 517 F.Supp. 987, 991 n. 2 (D.D.C.1981), *prob. juris. noted,* 455 U.S. 917, 102 S.Ct. 1272, 71 L.Ed.2d 457 (1982); *City of Richmond, Va. v. United States,* 376 F.Supp. 1344, 1349 n. 23 (D.D.C. 1974), *remanded on other grounds,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); *Beer v. United States,* 374 F.Supp. 363, 367 n. 5 (D.D.C.1974), *remanded on other grounds,* 425 U.S. 130, 133 n. 3, 96 S.Ct. 1357, 1360 n. 3, 47 L.Ed.2d 629 (1976); *City of Petersburg, Va. v. United States,* 354 F.Supp. 1021, 1024 (D.D.C. 1972), *aff'd,* 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 & *sub nom. Diamond v. United States,* 412 U.S. 901, 93 S.Ct. 2290, 36 L.Ed.2d 967 (1973); *New York State v. United States,* 65 F.R.D. 10, 12 (D.D.C.1974); *see also Trbovich v. United Mine Workers,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).

have members of a protected class elected in numbers equal to their proportion in the population.

96 Stat. at 134. The Senate Report on the 1982 Amendments stated that: "In light of the amendment to section 2, it is intended that a section 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2." S.Rep. No. 97–417, 97th Cong., 2nd Sess. (May 25, 1982) at 12 n. 31, *reprinted in* 1982 U.S.Code Cong. & Ad. News 177, 189 n. 31. In a Reply Brief to the Supreme Court in *City of Lockhart v. United States & Cano,* No. 81–802 (Oct. 1982) (filed by defendants in this action together with their Amended Memorandum on October 27, 1982), the United States noted the importance and complexity of the impact of the 1982 amendment of Section 2 on a Section 5 case: "Whether ... the 'results' standard of Section 2 can properly be imported into Section 5 presents a complex issue which can be decided only after a comprehensive assessment of the statutory scheme and legislative history." *Id.* at 4. The United States also represented that "[t]hat inquiry should be performed in the first instance by [a] district court." *Id.*

In order to best address the issue, as preserved by the intervenors, but not delay resolution of the primary subject of this action which has precluded County Council elections in Sumter County for at least four years, the Court will allow intervenors to preserve the issue, cross-examine witnesses and rebut evidence on it adduced by plaintiffs.

An accompanying Order will grant intervenors' motion. A separate accompanying Order will set a pretrial briefing schedule with the expectation that the parties (including defendants if they wish) may include in those briefs argument regarding the legal issues and an outline of the evidence which will be developed to resolve the Section 2 issue originally raised by defendants and now preserved by intervenors (including an estimate of any additional courtroom time required to adduce such evidence).

## MEMORANDUM ON SUMMARY JUDGMENT

The County Council of Sumter County, South Carolina (Sumter County), and two Sumter County officials brought this action against the United States pursuant to section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c ("the Act"). They have also invoked the Ninth, Tenth, Fourteenth and Fifteenth Amendments of the United States Constitution. Their amended complaint seeks declaratory judgment, implemented by an injunction, that an at-large method of electing the Sumter County Council is not subject to preclearance by the Attorney General of the United States under Section 5 of the Voting Rights Act of 1965; that if such preclearance is required, the Attorney General has already given it; and that, in any event, the at-large method at issue does not have the purpose or effect of denying or abridging the right to vote on account of race, color, or previous condition of servitude. In 1978, the two individual plaintiffs and other qualified electors of Sumter County voted in favor of the at-large method of election in a referendum. Plaintiffs now also seek declaratory and injunctive relief to protect the rights of the qualified electors of Sumter County to vote for the at-large method of election for County Council in a referendum, and to have the votes counted in the at-large elections which they advocate. Finally, they challenge as inappropriate and, therefore, unconstitutional, Congress's 1982 extension of the Act as applied to Sumter County.

Defendants, who are the United States, its Attorney General and its Assistant Attorney General for Civil Rights, have moved to dismiss and for summary judgment on six of the seven counts in the complaint. Plaintiffs have filed cross-motions for summary judgment, including a motion for partial summary judgment on Count III, the count on which defendants believe a trial is required. Meanwhile, when defendants retreated from an earlier contention concerning the interrelation between Sections 2

and 5 of the Voting Rights Act,[1] seven blacks voters of Sumter County moved for leave to intervene and to take a limited role in the proceedings henceforth.

All of these motions have been fully briefed, and all except the motion to intervene have been argued to this three-judge court. For reasons more fully stated below, the Court in an accompanying Order will deny the defendants' motion to dismiss and the plaintiffs' motion for summary judgment, and grant defendants' motions for summary judgment, thereby leaving for trial Count III in its entirety. The motion for limited intervention is the subject of a separate Memorandum and Order issued today.

## I

This case is a sequel to litigation which culminated in the decision of the Supreme Court in *Blanding v. DuBose*, 454 U.S. 393, 102 S.Ct. 715, 70 L.Ed.2d 576 (1982) (*per curiam*) rev'g, 509 F.Supp. 1334 (D.S.C. 1981). A brief account of that case will set the stage for this one.[2]

In *Blanding*, a number of citizens of Sumter County sought to enjoin at-large elections for Sumter County's County Council in 1978. In 1967, the South Carolina General Assembly passed Act No. 371, placing governmental powers for Sumter County in a County Council, whose members were to be elected at-large from the County. By oversight, plaintiffs allege, Act No. 371 was not submitted to the U.S. Attorney General for preclearance pursuant to the Voting Rights Act, and at-large County Council elections were held in Sumter County in

1968, 1970, 1972 and 1974.[3] In 1975, South Carolina passed the Home Rule Act, which permitted each of South Carolina's counties to select by referendum one of five alternate forms of local government contained in the statute, and to decide in the referendum whether the county governors would be elected from single-member districts or at-large. The Act specifically provided that if Sumter County held no referendum, the council-administrator system derived from Act No. 371 in 1968 would remain in place. Section 4–9–10(b). The Home Rule Act of 1975 was submitted to the U.S. Attorney General for preclearance; he interposed no objection at that time, but "he indicated that the outcomes of Home Rule Act referenda or assignments of forms of government under the Act would be subject to preclearance." 454 U.S. at 396, 102 S.Ct. at 716.[4] Thereafter, Sumter County held no referendum and by assignment the council-administrator system was elected at-large. In 1976, Sumter County submitted for preclearance Act No. 371 of 1967 and the County Ordinance implementing that Act on authority of the Home Rule Act. The Attorney General interposed no objection to the council-administrator form, but "made a timely objection to the at-large method of election of the Council." 454 U.S. at 396, 102 S.Ct. at 717. Private parties in Sumter County then instituted suit, and on June 21, 1978, the scheduled at-large elections for County Council were enjoined by a District Court in *Blanding v. DuBose*, No. 78–883 (D.S.C. June 22, 1978) (Defendants' Ex. C). In November 1978, the County went ahead

---

1. *Compare* Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment (Oct. 18, 1982) at 17–19 *with* an Amended Memorandum (Oct. 27, 1982) at 17.

2. *Blanding* had been consolidated in the three-judge District Court in South Carolina with another action involving the same subject matter as *Blanding* and the same parties as in the case now at hand. *See United States v. County Council of Sumter County*, No. 78–883 (D.S.C.); Exs. A, B & C to Defendants' Motion for Summary Judgment (Oct. 1, 1982). The government's appeal to the Supreme Court evidently was not perfected.

3. Upon application by the plaintiffs in *Blanding*, the South Carolina District Court enjoined the at-large elections scheduled in 1978, *see* Defendants' Motion for Summary Judgment (Oct. 1, 1982), Ex. C, and County Council elections evidently have not been held in Sumter County since that time.

4. The U.S. Attorney General's letter of August 28, 1975, to the South Carolina Attorney General with respect to the Home Rule Act had stated that such an "assignment of such forms of government also constitutes a change which is subject to preclearance requirements of the Voting Rights Act of 1965." Plaintiffs' Motion for Summary Judgment (Oct. 4, 1982) Ex. Q.

with a planned referendum, and a majority of voters in Sumter County approved an at-large method of election for County Council, despite the Attorney General's 1976 objection.

In 1981, the defendants in *Blanding,* including E.M. DuBose, one of the plaintiffs here, won a declaratory judgment from a three-judge District Court in South Carolina that the County had obtained preclearance from the Attorney General for at-large elections in June 1979, when the County had sent a letter to him reporting that the 1978 referendum had approved at-large council elections for Sumter County, and the Attorney General had failed to respond until September of that year, more than 60 days after receiving the letter. The District Court stated that the 1978 county referendum had approved an election method different from that in effect on November 1, 1964, and that the 1979 letter reporting its results was a request for preclearance. The District Court concluded that the Attorney General's failure to respond within 60 days as required by the Act constituted preclearance of the change by default. 509 F.Supp. at 1336–37. On appeal, the Supreme Court reversed, holding that the 1979 letter had been a request for reconsideration of the Attorney General's 1976 refusal to preclear the change, and was thus not subject to the 60-day requirement. *Blanding v. DuBose,* 454 U.S. at 399–401, 102 S.Ct. at 719.

Having failed to persuade the Attorney General to reconsider his 1976 refusal or to persuade the Supreme Court that the Attorney General had precleared the at-large method by default in 1979, plaintiffs now invoke the alternate remedy available to them under Section 5: seeking a declaratory judgment from this Court that the at-large election method of electing the county's governing body authorized for Sumter County by the General Assembly and the 1978 county referendum is not a "practice, or procedure with respect to voting different from that in force or effect on Novem-

ber 1, 1964," or if it is, that it either has been precleared or "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," within the meaning of Section 5 of the Voting Rights Act of 1965. 42 U.S.C. § 1973c. The complaint is in seven counts. We address them in order.

### A

Count I alleges that the at-large method of election did not establish a "practice or procedure with respect to voting [in Sumter County] different from that in force or effect on November 1, 1964," 42 U.S.C. § 1973c, and that it is therefore not subject to the requirements of the Voting Rights Act. Plaintiffs allege that before that date and until about 1968, the Sumter County Board of Commissioners, the local forerunners of the County Council, acted as a ministerial body only. It is a fact that that Board was appointed by the Governor of South Carolina on the recommendation of the Sumter County delegation to the South Carolina General Assembly. The legislative functions contemplated now for the County Council were allegedly performed prior to 1968 by the State Legislature which enacted local Sumter County bills on the recommendation of the Sumter County delegation. The plaintiffs' theory is that before November 1, 1964, the Sumter County delegation was the *de facto* governing body of Sumter County, and was elected at-large, and now the County Council would be the governing body and it would also be elected at-large. Since each body was or is to be elected at-large, plaintiffs argue that functionally there has been no method of election change that requires preclearance either by the Attorney General or this Court.

Plaintiffs' argument, although facile, simply ignores the Governor's *de jure* power before November 1, 1964, to appoint the county's governing body,[5] the Governor's *de jure* power to veto legislation (including local bills for Sumter and other counties) and the *de jure* power of the entire General

---

5. *Compare United States v. County Council of Charleston County, South Carolina,* 473 F.Supp. 641 (D.S.C.1979), where the pre-1964 County Commission was elected at-large.

Assembly to enact local laws for Sumter County different from those recommended by the Sumter County delegation. The plaintiffs' argument also ignores the legal fact that the Governor and the majority of the legislators who had the actual and legal powers to govern Sumter County were not elected at-large by the voters of Sumter County; they were elected by the' voters of the entire State of South Carolina. It may be that their legal powers were subject, by some diplomatic arrangements and customs, to the political power of the Sumter County delegation which, in turn, had legal powers over the local affairs of other counties. But, at the very least, legal authority over the local affairs and choice of Commissioners of Sumter County was shared between the Governor (elected statewide), the General Assembly (elected from all counties, only one of which was Sumter), and the County Commissioners (appointed by the Governor and confirmed by the General Assembly on recommendation of the Sumter County delegation).

In 1967, the General Assembly passed Act No. 371 (later implemented by the Home Rule Act of 1975). By vesting the local County Council with all local legislative powers and making it locally elected, Act No. 371 stripped away the legal power theretofore vested in the Governor, the General Assembly and the Sumter County delegation over local Sumter County affairs. It eliminated the power of South Carolina voters outside Sumter County over that County's local affairs. The 1967 law released the locally chosen County Commissioners from those actual and legal restraints, and from out-of-county voter influences, and vested in them all these legal powers, subject only to the will of the voters of Sumter County, voting at-large.

■ It may be that plaintiffs could prove at trial their proffer that the Governor and the General Assembly universally deferred (without any trade-offs) from 1895 until 1968 to the Sumter County delegation with respect to the governance of Sumter County, and that the County Commissioners were uniformly mere ministerial agents of the delegation. But the laws of 1967 and 1975 which eliminated the legal powers of the Governor and the General Assembly, persons elected by voters outside of Sumter County, over local affairs and vested it exclusively in a County Council elected at-large by Sumter County voters is too vast a change to ignore. As plaintiffs' counsel conceded at oral argument a *de jure* change as well as a *de facto* change in voting requires preclearance under the Act. Hearing Transcript (Nov. 29, 1982) at 17–18.[6] We note that both the District Court and the Supreme Court in *Blanding v. DuBose* stated that the Home Rule Act of 1975 (which implemented Act No. 371 of 1967) changed the voting method involved in the selection of supervisors in Sumter County. 454 U.S. at 395, 102 S.Ct. at 716 ("this change"), 399, 102 S.Ct. at 718 ("change to at-large County Council elections"); *Blanding v. DuBose,* No. 78–764, mem. op. at 1 (D.S.C. June 22, 1978) (Defendant's Ex. C) ("The record in these cases establishes conclusively that in 1967 the procedure for electing members of the County Council for Sumter County, South Carolina, was changed by statute"). Without regard as to whether the change was good or bad for the people of Sumter County, or for the advantage or disadvantage of any racial or other group there, we are persuaded as a matter of law that the institution of at-large elections for the unfettered Sumter County local government required preclearance.

Plaintiffs invite our attention to an opinion of the Supreme Court of South Carolina holding that, under the South Carolina State Constitution in place on November 1, 1964, the General Assembly enacted "many local laws" so that "for all practical purposes the county government was controlled by the Acts of the General Assembly" and "the General Assembly was the governing body of the respective counties." *Duncan v. York County,* 267 S.C. 327, 334, 228 S.E.2d 92, 95 (1976). The Supreme Court of

---

6. JUDGE BORK: ... [I]s it enough to trigger Section V that there was a *de jure* change?

MR. BELL: As I understand the case, it's either a *de jure* change or a factual change.

South Carolina noted that "it is common knowledge that only legislative delegations from the counties affected concerned themselves with local bills." Thus, "[i]n addition to being state legislators, members of the Senate and of the House were effectually the county legislature and governing board." *Id.* The foregoing statement of local law does not alter the fact that during all the years prior to 1967 the *de facto* power of the county delegation with respect to local legislation was subject to the *de jure* power of the entire General Assembly and the Governor, just as its *de facto* power over appointments to the local Board of Commissioners was subject to the *de jure* power of the Governor. This *de jure* scheme was unarguably altered by the 1967 and 1975 statutes, and constitutes a change cognizable under Section 5 of the Act.[7] *Accord Charlton County (Georgia) Board of Ed. v. United States,* No. 78–0564 (D.D.C. July 27, 1978) *Horry County (South Carolina) v. United States,* 449 F.Supp. 990 at 995 (D.D.C.1978).

Defendants urge us to preclude plaintiffs from litigating the question of whether there was a change in voting methods requiring preclearance because they raised (or could have raised) and lost that contention in the District Court proceedings which culminated in the Supreme Court's decision in *Blanding v. DuBose, supra.* The undisputed facts of the shift of power from the Governor and the General Assembly to the new County Council require a ruling for defendants on the merits of Count I without resort to the technicalities of collateral estoppel.

### B

Count II of the complaint, on which both parties seek summary judgment, alleges that the at-large method of election for Sumter County Council was precleared by the Attorney General's failure to object to two statutes (Act No. 1339 of 1968 and the Home Rule Act of 1975) relating to at-large elections for the Sumter County governing body. Undisputed facts show that plaintiffs' preclearance claim is without merit. These undisputed facts are that in 1967, Bill No. 371 established the seven-member Sumter County Commission, elected at-large. 1967 South Carolina Act No. 371. In 1968, Bill No. 1339 made a modest amendment to Act No. 371: it gave the Commission power to decide for itself which members would serve four year terms and which would serve two year terms, instead of directly specifying which members would so serve. Act No. 1339 did not affect the at-large method of election set forth in Act No. 371, and by itself the amendment might well not be a change in voting procedures requiring preclearance. For reasons which plaintiffs do not entirely explain, the South Carolina Attorney General did not submit Act No. 371 of 1967 to the Attorney General of the United States for preclearance, despite its broad-ranging effect on the organic relationship between the State Governor, the General Assembly, and the government of Sumter County. *See* pp. 700–701, *supra.* On July 29, 1968, an Assistant State Attorney General submitted to the U.S. Attorney General copies of seven acts passed by the General Assembly in its 1968 session; one of the seven was Act No. 1339.

 The U.S. Attorney General precleared neither of these Acts. Act No. 371 was not submitted to him. The letter that submitted Act No. 1339 did not request preclearance nor mention any voting changes. Defendants' Ex. B. *Cf. City of Rome v. United States,* 446 U.S. 156, 169 n. 6, 100 S.Ct. 1548, 1557 n. 6, 64 L.Ed.2d 119 (1980). Nor did plaintiffs claim in the litigation culminating in *Blanding v. DuBose,* to which they were party, that the 1968 transmittal of Act No. 1339 had any preclearance implications. Nevertheless, plaintiffs now claim that the Attorney General's

---

**7.** This resolution of the issue makes it unnecessary for us to reach the factual dispute as to whether the County Board of Commissioners appointed by the Governor (on recommendation of the County delegation) as of November 1, 1964, was a cipher, as contended by plaintiffs, or exercised joint governing responsibility with the state legislative delegation, as urged by defendants.

silence about Bill No. 1339 effected preclearance of the entire at-large election system. This claim is without merit. As the Supreme Court ruled in *United States v. Board of Commissioners of Sheffield, Ala.,* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978), a political subdivision must state that it desires preclearance before it can claim preclearance by silence. *Id.* at 136–38, 98 S.Ct. at 981. That ruling applies here and requires summary judgment for defendants on plaintiffs' claim that the Attorney General's silence about Act No. 1339 of 1968 precleared an at-large election system for Sumter County.

■ The other prong of plaintiffs' preclearance claim relates to the Home Rule Act of 1975. 1975 S.C. Acts, No. 283, codified as S.C. Code § 4–9–10 *et seq.* (1976 and Supp.1980) (Plaintiffs' Ex. M). The 1975 Home Rule Act implemented Act No. 371 and its counterparts applicable to other South Carolina counties. *See* pp. 699–700, *supra.* When the Home Rule Act was submitted for preclearance, the Attorney General reserved his right to object to any referenda or assignment results adhered to by local counties pursuant to that Act. When Sumter County submitted the 1967 Act No. 371 and its local ordinance implementing the Home Rule Act assignment of at-large elections to the Attorney General for preclearance in 1976, he "made a timely objection to the at-large method of election of the Council." *Blanding v. DuBose,* 454 U.S. at 396, 102 S.Ct. at 717. In 1978, the Attorney General declined to withdraw his objection to at-large elections for the council even if the election method were approved by county referendum; nevertheless, in November 1978, a county referendum opted for the at-large election method originally contemplated by Act No. 371. In *Blanding,* the Supreme Court held that a letter informing the Attorney General of the referendum results was only a request for reconsideration of the Attorney General's 1976 objection, and that Sumter County's at-large method of election still had not been precleared.

Despite the Supreme Court's ruling in *Blanding v. DuBose,* and the terms of the Attorney General's letter of August 28, 1975, *see* note 4, *supra,* plaintiffs persist in contending that the Attorney General's "attempt . . . to reserve his right to reconsider the assignment [of forms of government and methods of election] . . . was ineffective." Plaintiffs' Memorandum in Support of Motion for Summary Judgment (Oct. 4, 1982), at 16. They contend that the Home Rule Act itself established the form of government and method of election for each South Carolina county, including Sumter. According to plaintiffs, at that point, the Attorney General was obligated either to object or to forever hold his peace. They rely upon a statement of the South Carolina District Court made before the Supreme Court spoke in *Blanding v. DuBose* that the Attorney General was required to pass on "all components" of the Home Rule Act submission at the time of the submission; and that the subsequent passage of "adoptive ordinances merely implemented statutes which had been previously precleared." *United States v. County Council of Charleston County, South Carolina,* 473 F.Supp. 641, 646–47 (D.S.C.1979). Plaintiffs also rely upon a District Court's decision in *United States v. Georgia,* C.A. No. C76–1531A (N.D.Ga.1977), *aff'd. mem.,* 436 U.S. 941, 98 S.Ct. 2840, 56 L.Ed.2d 782 (1978). *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment (Oct. 4, 1982) at 16–17. Significantly, perhaps, this same October 4, 1982 Memorandum of plaintiffs fails to discuss or even cite the Supreme Court's opinions in *Blanding* or *Sheffield, supra.*

Defendants point out in response that when, in 1976, the Attorney General precleared the Home Rule Act, there was no way of knowing whether Sumter County would hold a referendum or not, or whether a referendum if held would select a new form of government or method of election and, if it did, which form or method it would adopt. Defendants point to regulations formulated by the Attorney General for the administration of Section 5 which adopt the traditional, common sense princi-

ple that he may refrain from reviewing voting changes prematurely. *See* 28 C.F.R. § 51.7 (1975); *cf.* 28 C.F.R. § 51.20 (1982). So here, defendants urge, the Attorney General precleared the "ripe" provisions of the Home Rule Act that transferred certain legal powers of the Governor and the General Assembly to local governments and created the right to hold referenda, while he reserved for future review those sequelae of the Home Rule Act which depended upon local decisions about whether to hold referenda and the results of those held.[8] *Cf. United States v. Board of Commissioners of Sheffield, Ala., supra.*

From the foregoing we are satisfied, again without reference to principles of collateral estoppel, that the Supreme Court's precedent of *Blanding v. DuBose,* the plain language of the Attorney General's letter of August 28, 1975, and ensuing events in Sumter County all combine to require that we reject plaintiffs' claim that the Attorney General precleared at-large elections when he reviewed the Home Rule Act of 1975. An accompanying Order therefore grants summary judgment to defendants on both issues raised by Count II of the complaint.

### C

In Count III of their complaint, plaintiffs assert that, even if the at-large method of election did represent change in method requiring preclearance, and, even if the change were not precleared by the Attorney General, it passes muster under Section 5 of the Voting Rights Act. More specifically, Count III alleges that the changes effected pursuant to Act No. 371 and the Home Rule Act of 1975 as implemented by the 1978 referendum, gave all Sumter County voters an opportunity to elect the members of the county's governing body, "which opportuni-

ty no voter in Sumter County enjoyed on November 1, 1964," Amended Complaint (Aug. 23, 1982), ¶ 39; augmented the ability of black voters to participate in the political process and to vote for their county's governing body "which was previously appointed by the Governor of South Carolina," *id.,* ¶ 40; does not abridge any right to vote on account of race, color, or otherwise; will not lead to "retrogression" in the position of racial minorities with respect to the effective exercise of their right to vote; and does not have the purpose or effect of diluting the voting strength of black voters in South Carolina.

Plaintiffs move only for a partial summary judgment on Count III: that the "change" does not have the effect of "denying or abridging the right to vote on account of race or color." 42 U.S.C. 1973c.[9] Plaintiffs contend that before and after the change black voters voted in the election for Sumter County's governing body: before the change the legislative delegation was the governing body and was elected at-large; after the change the County Commission was the governing body and was also so elected. Secondly, plaintiffs support their motion with proffers of evidence that the "black community . . . did not object to the at-large method of election for members of the Commission, but in fact welcomed the opportunity to be able to vote for members of the Commission." Plaintiffs' Memorandum (Oct. 4, 1982), *supra,* at 23. Thirdly, plaintiffs urge that the pre-1964 Board of Commissioners was appointed and no black had any role in appointing a member of the Board, whereas the method at issue gives all voters, black and white, a role in the process. Since the black voters now have a right to vote for members of the County Commission which they did not

---

**8.** Ignoring *Charleston County* (as did the Supreme Court in *Blanding v. DuBose*), defendants distinguish *United States v. Georgia, supra,* on the ground that the voting changes which the Attorney General purported to reserve for review in that case were all in place when he reviewed Georgia's Home Rule Act, whereas the Sumter County changes on which the Attorney General reserved judgment were uncertain and yet to take effect when he ruled

on part of South Carolina Home Rule Act and reserved on other parts. Amended Memorandum of the United States in Opposition to Summary Judgment (Oct. 27, 1982) at 13–14. This appears correct to the Court.

**9.** Defendants make no cross-motion with respect to Count III and contend a trial is necessary on that count as a whole.

previously have, defendants claim on authority of *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), and *Charlton County Board of Ed. v. United States,* C.A. No. 78-0564 (D.D.C.1978), that the minority's ability to participate is actually increased.

Defendants point out that plaintiffs would test for retrogression by comparing the role of black voters before 1967 with their role now, even though plaintiffs sought no preclearance in 1967 and the matter is only coming to issue in 1983. Defendants contend that retrogression must be tested by examining how the appointive system used prior to 1967 would operate *today* as compared to how an at-large system in place *today* would operate. Defendants refer us for guidance to the Supreme Court's decision in *City of Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). There, as here, the local jurisdiction had delayed the preclearance process, in that case with respect to several annexations to municipality of Rome, Georgia. The Supreme Court endorsed the procedure, once the case finally came to litigation, of responding "to the realities of a situation as they exist at the time of decision." *City of Rome v. United States,* 472 F.Supp. 221, 247 (D.D.C.1979), *aff'd.,* 446 U.S. 156, 186, 100 S.Ct. 1548, 1566, 64 L.Ed.2d 119 (1980).

In traversing the plaintiffs' motion, defendants proffer deposition testimony from qualified political historians and local South Carolina political figures that if an appointive system were operative today at least two black persons would be serving on the county's governing board, two more than now serve. We agree with defendants and *City of Rome* that we should consider a comparison of the appointive and at-large methods in the context of the present. Accordingly, the defendants' proffer raises an issue of fact about retrogression which cannot be resolved without an evidentiary hearing.

In addition, defendants originally contended that even if the change from the appointive method which previously obtained to the current at-large system were not demonstrably retrogressive, defendants are entitled to an opportunity to show that the changed method is itself discriminatory, and that plaintiffs have the burden of establishing that the at-large system does not violate section 2 of the Voting Rights Act.[10] Defendants subsequently have abandoned their contention that plaintiffs have an obligation to satisfy Section 2 requirements.[11] Defendants preserve, however, the contention that, according to *Beer,* even if a change is not retrogressive, it may not be precleared if it "discriminates on the basis of race or color so as to violate the Constitution." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976); *see Busbee v. Smith,* 549 F. Supp. 494 (D.D.C.1982). *Compare* Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment (Oct. 18, 1982) at 17 n. 7, *with* Amended Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment (Oct. 27, 1982) at 17. In support of their amended opposition argument that the new method is unconstitu-

---

**10.** The Voting Rights Act Amendments of 1982, Pub.L. No. 97-205, 96 Stat. 131, amended Section 2 of the Act to read that

No voting ... practice or procedure shall be imposed or applied ... in a manner that results in a denial or abridgement of the right ... to vote.

*See* 96 Stat. at 134. The Senate Report on the 1982 Amendments stated that by amending Section 2, "it is intended that a section 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2." S.Rep. No. 97-417, 97th Cong., 2d Sess. (May 25, 1982) at 12 n. 31, *reprinted at* 1982 U.S. Code Cong. & Ad.News 177, 189 n. 31. De-

fendant United States has argued in its Reply Brief to the Supreme Court in *City of Lockhart v. United States & Cano,* No. 81-802, (Oct. 1982) that "[w]hether ... the 'results' standard of Section 2 can properly be imported into Section 5" should be determined "in the first instance" by a District Court. *Id.* at 4 (filed in this action together with Defendants' Amended Memorandum, Oct. 27, 1982).

**11.** This argument will apparently be preserved, however, by the intervenors in this action whose petition to intervene is granted today in a separate Memorandum and Order.

tionally discriminatory, defendants proffer substantially the same evidence that they originally had proffered in support of their Section 2 argument: e.g., expert testimony concerning the historical evidence of racial discrimination in South Carolina governments (including Sumter County's); the purpose and effect of the institution of an at-large voting system in Sumter County; alleged racial polarization of voting in the county; and difficulties encountered by blacks seeking political support in Sumter County at-large, as distinguished from in single member districts. Defendants' Amended Memorandum, *supra*, at 19–22. Defendants suggest that the retrogression, purpose and effect questions are inextricably intertwined, that decision on all of these issues should be postponed until after the trial on the merits, and that therefore plaintiffs' motion for partial summary judgment on retrogression should be denied.

We agree that decision on all of these questions depends upon facts which should be developed at trial. Accordingly, we will follow the example of our colleagues in *Busbee v. Smith, supra,* to the extent of reserving resolution of these issues until after trial. In addition, a separate Order filed today will grant the motion to intervene filed by interested black voters of Sumter County thereby preserving the Section 2 argument now raised by them and permitting them to cross-examine witnesses and possibly adduce rebuttal evidence.

### D

Count IV of the complaint alleges that the Attorney General will object to any method of election other than a single-member district method, and that such a method would dilute the voting strength of black voters in Sumter County and deny and abridge their right to vote in violation of Sections 2 and 5 of the Voting Rights Act and the First and Fifteenth Amendments of the Constitution. Cross-motions for summary judgment dispute whether we can, or should, anticipate in this proceeding

the position that the Attorney General would take, if we later invalidate the at-large election method at issue here. As defendants point out, however, we have no authority either to review, or to preview, decisions of the Attorney General under Section 5. Defendants' Motion for Summary Judgment (Oct. 1, 1982) pp. 8–9, ¶ 9; *see Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). Plaintiffs seek a declaratory judgment in the nature of an advisory opinion with respect to a matter over which we have no jurisdiction. Even if the Attorney General's intention were as alleged,[12] it is not within our power to anticipate or rule on it; this Court's role under Section 5 of the Act is to examine the change *de novo* as an alternative to the Attorney General's decision regarding preclearance. Accordingly, the accompanying Order will deny plaintiffs' motion for summary judgment on Count IV and grant defendants' motion thereon.

### E

In Count V, plaintiffs claim that defendants' refusal to preclear the method of election for which the individual plaintiffs voted in the 1978 referendum denied and impaired their constitutional right to vote and the similar right of all of the other citizens who voted in the 1978 referendum for the at-large system, and effectively denied their rights to vote in scheduled at-large elections pursuant to the Home Rule Act. Plaintiffs invoke the First, Fifth, Ninth and Tenth Amendments, as well as Section 17 of the Voting Rights Act.

Again, in Count V, the plaintiffs are challenging the failure of the Attorney General to preclear the at-large method of election for Sumter County. For reasons already stated, our role must be limited to *de novo* consideration of whether the method of election violates rights protected by the Voting Rights Act or the Constitution. We cannot sit in judgment here upon whether the Attorney General's refusal to preclear violated rights asserted by plaintiffs. *See*

---

**12.** Defendants state that plaintiffs have misstated defendants' true position on this issue.

Defendants' Motion for Summary Judgment (Oct. 1, 1982), p. 9, ¶ 9, and Ex. D.

*Morris v. Gressette, supra; City of Rome v. United States,* 450 F.Supp. 378, 380–82 (D.D.C.1978). Plaintiffs are not entitled to any declaratory judgment about the effect on them of defendants' refusal to grant Section 5 preclearance. The accompanying Order will grant defendants' motion for summary judgment on Count V.

### F

Count VI is a rather bold demand that this Court in effect overrule decisions of the Supreme Court validating Congress's decision to apply the Voting Rights Act to some States and not to others. Since this issue has been resolved by the Supreme Court, plaintiffs may be raising it here to preserve it for reconsideration by the Supreme Court upon appeal. Our accompanying Order granting the defendants' motion for summary judgment on Count VI will accomplish this. *See City of Rome v. United States,* 472 F.Supp. 221, 235 (D.D.C.1979), aff'd., 446 U.S. 156, 180, 100 S.Ct. 1548, 1563, 64 L.Ed.2d 119 (1980); *South Carolina v. Katzenbach,* 383 U.S. 301, 324–28, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966).

### G

■ Count VII of the complaint challenges the constitutionality of the 1982 amendments to Section 5 of the Voting Rights Act of 1965 on the ground that Congress failed to make current factual findings about the extent of voting registration in 1975 and 1982 comparable to the congressional findings made on this subject to justify the Voting Rights Act legislation enacted in 1965. With regard to Congress's 1975 extension of the Act, the Supreme Court has ruled that it was constitutionally accomplished. *City of Rome v. United States, supra,* 446 U.S. at 180, 100 S.Ct. at 1563. Defendants maintain, in effect, that the voting discrimination that justified the 1965 Act has been eliminated, at least in South Carolina and in Sumter County, so

that the conditions found to exist in 1965 can no longer justify extending the regional requirements of the Voting Rights Act in 1982. Specifically, plaintiffs point to Section 4(b) of the Act which made the Act applicable to a state or political subdivision only if less than half of the state's or subdivision's voting population was registered to vote on November 1, 1964. Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Oct. 18, 1982) at 51. Plaintiffs proffer without contradiction that while less than half of the voting populations of South Carolina and of Sumter County were registered to vote in 1964, on May 28, 1982, slightly more than half were registered. These circumstances, plaintiffs claim, distinguish the 1982 extension as applied to them from the circumstances relied upon in *South Carolina v. Katzenbach, supra,* to uphold the 1964 Act.

Defendants respond that voting practices in Sumter County have not changed so remarkably as to justify this Court's re-examination of the factual premise for Congress's decision to include the county in the category of political entities embraced by the Voting Rights Act as amended. Indeed, defendants point out that the Senate Judiciary Committee specifically mentioned Sumter County as a jurisdiction which had not yet complied with Section 5 as it was enacted in 1964. *See* S.Rep. No. 97–417, 97th Cong., 2nd Sess., p. 14 (May 25, 1982), *reprinted at* 1982 U.S.Code Cong. & Ad.News 177, 191. Obviously, the preclearance requirements of the original act and its 1982 amendment had a much larger purpose than to increase voter registration in a county like Sumter to more than 50 percent. We are not persuaded that the difference between the background circumstances which prevailed in Sumter County in 1964 as related by plaintiffs in support of their motion and those obtaining today, justify our re-examination of the firm conclusions made by Congress in extending the Act,[13]

---

13. We note that both Houses of the 97th Congress held hearings, produced extensive reports, and held lengthy debates before deciding to extend the Act in 1982. *See,* e.g., S.Rep. No.

97–417, 97th Cong., 2d Sess. (May 25, 1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 177–410; H.R.Rep. No. 97–227, 97th Cong., 1st Sess. (Sept. 15, 1981); 128 Cong.Rec., Nos.

and the Supreme Court in *City of Rome* and *South Carolina v. Katzenbach, supra,* in holding that the categories chosen by Congress were and are appropriate. Accordingly, plaintiffs' motion for summary judgment on Count VII will be denied, and defendants' will be granted. This ruling is without prejudice to reopening of the issue of the constitutionality of the 1982 amendments by the plaintiffs or by the Court, *sua sponte,* if the proof at trial should require reconsideration of this aspect of the case.

74–77 (daily eds. June 14–18, 1982) (Senate); 128 Cong.Rec. H3839–H3846 (daily ed. June 23, 1982) & 127 Cong.Rec. H6938–H7011 (daily ed. Oct. 5, 1981) (House).